IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2008

Charles R. Fulbruge III
Clerk

No. 06-40957

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

RAYMOND MATA

Defendant-Appellant

Appeal from the United States District Court
For the Southern District of Texas

Before JOLLY, CLEMENT, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

After police uncovered approximately 1,283 kilograms of marijuana and several firearms, Raymond Mata was indicted on four counts: (1) conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A); (2) possession with intent to distribute more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); (3) conspiracy to maintain a drug involved premises in violation of 21 U.S.C. §§ 856(a)(2) and (b) and 846; and (4) knowingly using or possessing a firearm in relation to and in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii). The district court severed and dismissed counts 2 and 3, without prejudice to re-indictment

in the District of Illinois. Mata's pre-trial motion to suppress evidence of the marijuana was denied. After a jury trial, Mata was convicted on Count 1 and acquitted on Count 4. Mata appeals the denial of his pre-trial motion. We affirm the trial court's denial.

I

Immigration and Customs Enforcement ("ICE") agents uncovered a tractor-trailer containing marijuana after a Pharr, Texas business notified police of suspicious behavior. The drugs were hidden within twenty wooden pallets containing Mexican pottery.

The ICE agents learned from the bill of lading that the pottery was destined for Chicago and decided they would attempt to make a controlled delivery to "Jim," the contact person named on the bill of lading. Undercover agents from the Pharr police department drove the truck to Illinois, and Chicago and Illinois police installed transmitting beacons within four of the pallets and parked the truck at a state police facility overnight.

The following morning, the undercover officers drove the truck to the address listed on the bill of lading, which was a Wal-Mart. The undercover officers called "Jim" at approximately 10:00 a.m. to ask for further instructions. "Jim" told the officers to wait. Soon after, the police surveillance team observed two vehicles approach the truck. The occupants exited and instructed the undercover officers to follow them to the delivery site, Ray's Auto and Truck Repair, owned by Mata and his wife. The undercover officers arrived at Mata's business at approximately 12:25 p.m. Undisputed testimony described Mata's business as a small lot enclosed by a cyclone fence with barbed wire and a gate, secured by a lock and chain. The lot contained numerous parked automobiles and a brick building with a door and garage door large enough to accomodate trucks.

The truck was admitted to the premises, and Mata and others assisted the undercover officers in unloading the truck inside Mata's garage. Mata signed the bill of lading, and the undercover officers left about 30 minutes after arriving. By this time, approximately twenty-five ICE agents and local police surrounded and surveilled Mata's garage. For approximately two hours, officers watched as numerous vehicles and unknown individuals came and went. Mata left his garage at approximately 2:00 p.m., after the controlled delivery was completed.

Between 2:30 and 2:45 p.m., police officers observed a white box truck preparing to leave Mata's garage. Officers testified that they believed the truck, which had been loaded in the garage, contained some or all of the marijuana. As the truck left Mata's business, the police, fearing the large amount of marijuana could be lost, gave the "take down" signal, quickly blocked traffic, turned on their emergency lights, identified themselves as police, and ordered the individuals standing outside the gate to stop. As the police approached, at least two men fled down the street and two more fled to the rear of the lot. The ICE agents and police were able to detain these fleeing individuals and arrested 7-10 men in total.

Immediately after the raid, special agent Glen Comesanas ordered a "safety personnel sweep" of the garage. At the suppression hearing, Comesanas testified that he was concerned that other suspects, who might be a danger to officers and passers-by, remained inside, but he admitted he had "no idea" one way or the other. At trial, Comesanas testified that roughly five to six officers entered the building to sweep likely hiding spaces. During the sweep, the officers did not find any individuals, but they saw substantial amounts of marijuana and firearms in plain view. After the sweep, the officers left the building, secured the perimeter, and awaited a formal search warrant that agents had attempted to secure that afternoon. This warrant never arrived.

At approximately 5:00 p.m., Mata and his wife arrived at the garage. Mata identified himself as the owner of the garage, and Agent Comesanas testified that Mata gave verbal consent for agents to search the business. Mata, however, refused to sign a "Consent to Search" form, and, according to Comesanas, said: "Maybe I should talk to my lawyer." Agent Comesanas told Mata that he was free to do so. Mata picked up his cell phone, scrolled through several phone numbers, but declined to make a call.

During this conversation, Mata' wife Julia entered the garage. She signed the consent form, at which point officers began searching Mata's garage. According to Agent Comesanas, Mata never withdrew his verbal consent nor did he object to his wife signing the consent form. The officers found marijuana throughout the garage and inside the white box truck. Officers attempted to open a safe but could not. Mata provided the combination and assisted officers in opening the safe. Inside the safe, officers discovered additional firearms. After the search the officers did not arrest Mata and at no time during the search was Mata under arrest.

On October 26, 2004, a grand jury returned a superseding indictment charging Mata and others with four counts. The district judge dismissed two of the counts for lack of jurisdiction but without prejudice to re-indictment in Illinois. Mata filed a pre-trial motion to suppress evidence, arguing that the search was warrantless, relied on legally invalid consent, or both. After a hearing, the district court denied the motion and found that (1) the police conducted a valid and legitimate protective sweep and (2) the Matas provided valid legal consent to the search.

After a jury trial, Mata was convicted of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A) but acquitted of knowingly using or possessing a firearm in relation to and in furtherance of a drug trafficking crime in violation

of 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii). He was sentenced to 156 months in prison, five years supervised release, and fined. Mata timely appealed.

II

Mata contends that the district court erred in denying his motion to suppress evidence discovered during the officers' protective sweep and during the search conducted after Mata returned to his business. First, Mata argues that the Government's reliance on exigent circumstances and consent are pretextual efforts to save an illegal search conducted after they failed to obtain a search warrant. Specifically, Mata argues the Fourth Amendment's "protective sweep" exception is inapplicable here because he alleges the officers lacked any specific, articulable facts required under the exception. Additionally, Mata argues his consent was invalid, irrelevant, the fruit of the illegal seizure, and not free and voluntary. He also argues his wife's consent is invalid because the seizure of the marijuana occurred before she arrived. Finally, he contends that the firearms were the only evidence derived from consent, not the marijuana, and he was acquitted of the weapons charge.

The government contends that the officers' "safety personnel sweep" met a lawful exception to the Fourth Amendment. Thus, the officers lawfully seized the marijuana and firearms in plain view during the sweep. The government also contends that the firearms seized in the safe were seized pursuant to the free and voluntary consent of Mata and his wife.

In an appeal of a denial of a motion to suppress evidence, this Court reviews the District Court's legal conclusions de novo and its findings of fact for clear error.[1] Whether consent to a warrantless search is voluntary is a finding

---

[1] United States v. Keith, 375 F.3d 346, 348 (5th Cir. 2004).

of fact reviewed for clear error.[2]  The Court may affirm a district court's ruling on a motion to suppress on any basis established by the record.[3]

Warrantless searches are per se unreasonable under the Fourth Amendment, subject to a few specific exceptions.[4]  The government advances two such exceptions: first, that the initial search was valid because it was incident to arrest and, second, that the Matas consented to the search of their property.

A

We first consider the initial sweep of Mata's garage that discovered marijuana and weapons in plain view immediately after the 7-10 individuals were arrested outside the gate leading into the premises.  There are three variations of the post-arrest exception potentially applicable to the officers' "safety personnel sweep."  First, incident to an arrest, law enforcement officers may contemporaneously search areas within the arrestee's immediate control to prevent the destruction of evidence or procurement of a weapon.[5]  Second, officers may search areas immediately adjoining the place of arrest, such as closets and other spaces, from which a surprise attack could occur.[6]  Probable cause or reasonable suspicion is not necessary for these first two variations.[7]  Third, officers may also perform cursory "protective sweeps" of larger areas if they have articulable facts plus rational inferences that allow a reasonable officer to suspect that an individual dangerous to the officers is within the area

---

[2] United States v. Vega, 221 F.3d 789, 795 (5th Cir. 2000).

[3] United States v. Ibarra-Sanchez, 199 F.3d 753, 758 (5th Cir. 1999).

[4] Coolidge v. New Hampshire, 403 U.S. 443, 474-475 (1971).

[5] United States v. Green, 324 F.3d 375, 378 (5th Cir. 2003) (citing Chimel v. California, 395 U.S. 752, 763 (1969)).

[6] Maryland v. Buie, 494 U.S. 325, 334 (1990).

[7] Id.

to be searched.[8] The government contends that one or all of these variations justified the officers' search.

This court's precedent demonstrates that the officers' search of Mata's business does not meet the first variation, a search incident to an arrest to prevent the destruction of evidence or procurement of a weapon. In United States v. Green,[9] officers arrested defendant Green ten feet from his vehicle and then searched the glove compartment in his car, where they found a firearm.[10] This court held that since Green was handcuffed and ten feet from his car, the search was not justified by concerns that Green would reach the firearm either to use it or destroy it as evidence.[11]

In this case, testimony at both the suppression hearing and at trial established that the 7-10 individuals who were arrested were apprehended at the gate surrounding the lot and entirely outside the building. At trial, Agent Comesansas additionally testified that, in his recollection, both the garage door and entrance door to the building were closed. While no testimony revealed the distance from where the individuals were arrested to inside the building, like the defendant in Green, it is unlikely that the 7-10 individuals would have accessed the inside of Mata's business to obtain a weapon or destroy evidence.

Likewise, the officer's search does not meet the second exception, a search of immediately adjoining areas to prevent surprise attacks.[12] In United States v. Charles,[13] this Court upheld a precautionary search when officers quickly

---

[8] Id.

[9] 324 F.3d 375 (5th Cir. 2003).

[10] Id. at 378.

[11] Id. at 379.

[12] Maryland v. Buie, 494 U.S. 325, 334 (1990).

[13] 469 F.3d 402 (5th Cir. 2006).

entered a 10′ by 25′ storage unit in which they found the defendant. The officers approached the storage unit, ordered the defendant outside, and arrested him without a warrant. One officer quickly entered the unit, which contained a car, to check beneath, behind, and inside the car to confirm no other person was hiding. During this brief entrance, the officer noticed in plain view narcotics and a firearm. Charles argued that once he was outside the unit nothing inside was within his immediate control and that the officer lacked articulable facts justifying the sweep. This court concluded that the officers were justified in searching the unit because Buie held that police may as a precautionary matter and without probable cause or reasonable suspicion look in closets and spaces immediately adjoining the place of arrest from which an attack could be launched.[14]

While the exact dimensions of Mata's property were never discussed, his facility is substantially larger than the areas the Supreme Court and this court have described as immediately adjacent areas. Additionally, were this court to allow precautionary searches of such large areas incident to arrest, without some reasonable, articulable suspicion, this exception would quickly swallow the rule.

However, under the third variation, a protective sweep of a larger area may be lawful if other circumstances are present. This court has identified several requirements for a valid protective sweep. First, the police must have entered legally and for a legitimate law enforcement purpose.[15] Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene.[16] Third, the protective sweep must be limited to a cursory inspection of only those spaces where a

---

[14] Id. at 405 (citing Buie, 494 U.S. 334 (1990)).

[15] United States v. Gould, 364 F.3d 578, 587 (5th Cir. 2004).

[16] Id.

person may hide; it is not a full search of the premises.[17] Finally, officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.[18] Mata contends several of these requirements were not met.

As an initial matter, Mata suggests that the officers' entrance was illegal because the police unlawfully arrested the 7-10 individuals, citing Ybarra v. Illinois.[19] Regardless of the lawfulness of those individuals' arrest, this court has held that lawful arrest is not an indispensable element of a protective sweep.[20] Even assuming, arguendo, that the 7-10 individuals were arrested unlawfully, the officers need only meet the Buie standard requiring a reasonable belief based on specific and articulable facts that the area to be swept contains dangerous individuals.[21] The government need not prove the sweep was incident to a lawful arrest.[22]

Mata also contends that the officers' entrance was unlawful because no exigent circumstances existed allowing the officers to enter without a warrant. The existence of exigent circumstances is a finding of fact reviewed for clear error.[23] This court has created a non-exhaustive five-factor list to determine whether exigent circumstances exist: (1) the degree of urgency involved and the

---

[17] Id.

[18] Id.

[19] 444 U.S. 85 (1979) (holding that a search warrant giving authority to search a public bar and the bartender did not extend to searches of bar patrons when the police lacked a reasonable belief that the patrons were involved in criminal activity or were dangerous).

[20] Gould, 364 F.3d at 584.

[21] See id.

[22] Id.

[23] United States v. Gomez-Moreno, 479 F.3d 350, 354 (5th Cir. 2007).

amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage.[24]

Exigent circumstances do not include the likely consequences of the government's own actions or inactions.[25] Mata argues that in this case the government created the exigency when it issued its "take down" order to stop the white box truck that attempted to depart from Mata's place of business.

In United States v. Vega,[26] this court concluded the police had improperly justified a warrantless search with exigent circumstances of its own making. In that case, an informant notified police officers that three men in a specific car were likely carrying weapons and cash to purchase a large amount of narcotics.[27] The police located and monitored the men at a house, and before acquiring a search warrant or observing events creating probable cause, three officers approached the house to request permission to search. After knocking and identifying themselves as police, the defendant ran out the back door where he was arrested. The arresting officer heard movement inside and entered through the back door to protect his fellow officers. The government argued that when the officer entered the house, the occupants might dispose of illegal substances or endanger the officers. This court disagreed and stated that the moment to

---

[24] Id. at 354-55.

[25] Id. at 355 (citing United States v. Vega, 221 F.3d 789, 798-99 (5th Cir. 2000)).

[26] 221 F.3d 789 (5th Cir. 2000).

[27] Id. at 793-94.

10

determine whether exigent circumstances existed was before the defendant was aware of the officers' presence. The court examined those five factors and determined that when the officers approached no urgency existed requiring immediate resolution or confrontation. The court noted that no evidence existed demonstrating that the defendant was attempting to remove evidence or endanger the officers before he became aware of their presence through the officers' actions.

Similarly in United States v. Munoz-Guerra,[28] this court again held that officers had relied on exigencies of their own making. In that case, a tipster informed police that the defendant's condominium was used to store large quantities of narcotics, money, and firearms. Police officers and DEA Agents observed through a ground-floor window a marijuana cigarette and a bag of white powder. The officers immediately knocked on the door. When Munoz-Guerra responded, he claimed he needed a key to unlock the door. Concerned that Munoz-Guerra might destroy evidence or obtain a weapon, the agents entered the home without a warrant, conducted a security search, and discovered narcotics and weapons. The district court upheld the search, citing the officers' observations through the window, but we reversed and held that exigent circumstances must be examined at the point before the defendant was aware of the officers' presence. The officers' confrontation of Munoz-Guerra created the exigency, since a protective search was certain to happen after Munoz-Guerra became aware of their presence. Thus the relevant inquiry was whether exigent circumstances justified the agents' approaching the door.[29]

Mata argues that the government created the exigency when its officers gave the "take down" signal. But as Agent Comesanas testified, given the

---

[28] 788 F.2d 295 (5th Cir. 1986).

[29] Id. at 298.

circumstances, including the time the white box truck remained at Mata's repair shop, his experience led him to believe that the truck was a load vehicle, likely used to transport the marijuana. Additionally, the district judge found that the evidence indicated that the white truck was most likely a load vehicle and that the police believed if they did not stop the truck, the marijuana, or part of it, would be gone. Given this testimony, the exigency was the white box truck leaving. That exigency occurred before the officers approached Mata's business and was the lawful justification for that approach.

Mata contends that the officers only stopped the truck at the gate to create the exigency, and if they were truly concerned with only recovering the marijuana, the officers could have detained the truck down the road. We have rejected a very similar argument in another case.[30]

Additionally, Mata contends the exigency is merely a pretext for a warrantless search because the officers could have obtained a warrant before the search and arrest. But as trial testimony explained, the officers did not know the drop location beforehand. The bill of lading directed the undercover officers to a Wal-Mart parking lot. They called the telephone number listed on the bill of lading and were told to wait and then follow the individual to a previously undisclosed location. The undercover officers arrived at Mata's business at approximately 12:30 p.m. Only then could the officers have satisfied the Fourth Amendment's requirement that warrants must "particularly describe[] the place

---

[30] See United States v. Carrillo-Morales, 27 F.3d 1054, 1063 (5th Cir. 1994) (holding that the officers' fears that they could lose contraband in traffic and endanger officers and other motorists if the driver decided to evade the police was sufficient to stop the vehicle).

to be searched."[31]  We have previously held that officers are not required to obtain a warrant as soon as practicable.[32]

Mata argues that since other vehicles had come and gone during the day, the white box truck's departure could not create an exigency.  Under the standard of review and given both the district judge's findings and witness testimony, no clear error exists as to whether the truck's departure created an exigency.  The testimony at trial and at the suppression hearing recounted several facts, including the amount of time the truck was present and the manner in which it was loaded, that indicated the reasonableness of the officers' belief that the truck was about to leave and that it contained the marijuana.  When we consider this testimony coupled with the knowledge the police had from the controlled delivery, and viewing these facts in the light most favorable to the government as the prevailing party, we do not find that the officers created the exigency or that it was unreasonable to act in the manner the officers did.

Mata next contends that the officers lacked a reasonable, articulable suspicion that the area to be swept contained a person posing a danger to those on the scene.  Mata makes specific mention of Agent Comesanas's testimony that he had "no idea" who was inside, and thus he felt the sweep was necessary to protect the officers; Mata also notes that the district judge predicated his

---

[31] U.S.CONST. amend. IV.

[32] Carillo-Morales, 27 F.3d at 1063 ("[O]fficers are not required to obtain a warrant as soon as it is practicable to do so."); see also United States v. Webster, 750 F.2d 307, 327 (5th Cir. 1984) ("It is, of course, axiomatic that agents are not required to obtain a search warrant as soon as practicable to do so.  Moreover, an officer's failure to avail himself of an early opportunity to obtain a warrant will not automatically preclude him from relying on exigent circumstances that may arise later. . . .  That the exigency was foreseeable at the time the decision was made to forego or postpone obtaining a warrant does not, by itself, control the legality of a subsequent warrantless search triggered by that exigency. . . .  Thus, unlike the case of the 'routine' felony arrest, where a given individual and a distinct crime is involved, the fluidity of an ongoing investigation of the distribution of narcotics makes the obtaining of an adequate search warrant more difficult to time in the flow of events.") (citations omitted).

decision on his finding that "the officers had no idea as to whether there were other individuals with weapons inside." But while the officers might have lacked articulable facts as to the specific identity of any individual within the building, the trial court found and testimony supported a reasonable, articulable suspicion that the area to be swept contained a person posing a danger.

First, the officers did not merely suspect that the individuals might possess contraband, as in the Munoz-Guerra or Vega cases; the officers knew with absolute certainty. Undercover police working with the officers had only hours before made a controlled delivery of 1,283 kilograms of marijuana. Throughout the surveillance, Mata acknowledges and the testimony demonstrated that numerous cars and individuals entered and exited the lot, which meant that at any given time the officers might have lacked an accurate count of suspects present. Second, the testimony also revealed that individuals were conducting counter-surveillance—keeping an eye out for law enforcement—while the marijuana was inside Mata's garage. When the police gave the "take down" signal, at least four individuals ran in different directions, including two behind Mata's building.

This case is similar to United States v. Watson,[33] in which this court upheld a protective sweep. In that case, the district court had found that the police knew Watson and another accomplice had entered Watson's house with drugs, creating a possibility that the drugs could be destroyed or removed if not seized. The officers believed that Watson might have additional accomplices who could pose a danger, even though the officer who made the sweep testified that he lacked specific reason to believe other individuals were in the house, but that their presence existed as a possibility.[34] This court held that while the factual

---

[33] United States v. Watson, 273 F.3d 599, 603 (5th Cir. 2001).

[34] Id. at 601.

14

basis might be disputable, it was reasonable enough that this court could not say the district court's holding was erroneous. This case is also similar to cases from outside this circuit upholding a protective sweep incident to a raid on a distribution or manufacturing center for narcotics.[35]

Given this court's precedent, the standard of review, and the district court's factual findings, we cannot say that the district court erred in upholding the protective search and in denying the motion to suppress evidence of the marijuana and firearms found in plain view during that sweep.

B

We now consider whether the Matas' consent justified a warrantless search of the garage. A consensual search is another well-established exception to the Fourth Amendment's warrant requirement.[36] Only free and voluntary consent justifies a warrantless search.[37] In reviewing a finding that consent was

---

[35] See, e.g., United States v. Smith, 131 F.3d 1392, 1397 (10th Cir. 1997) (holding that police "could rationally infer . . . that Mr. Snider had accomplices in either [his] house or garage" and therefore could conduct a protective sweep when they were aware that Snider was operating a methamphetamine operation at the premises, where others were living and assisting him and where he had been observed shortly before the sweep); United States v. Mickens, 926 F.2d 1323, 1329 (2d Cir. 1991) (upholding a protective sweep of the defendant's residence based on officer's reasonable belief that defendant was a drug dealer with violent tendencies); United States v. Castillo, 866 F.2d 1071, 1081 (9th Cir. 1988) ("While the officers did not know if anyone else was in the [defendant's] apartment at the time of entry, they were aware that several persons were participants in [defendant's] conspiracy, any one of whom might be then present in the [defendant's] apartment guarding their cocaine supply or large sums of money received from prior sales. . . . We are satisfied that the facts known to the officers prior to their entry demonstrate their [protective sweep] was warranted."). Cf. United States v. Hoyos, 892 F.2d 1387, 1397 (9th Cir. 1989) ("If the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another."), overruled on other grounds by United States v. Ruiz, 257 F.3d 1030 (9th Cir. 2001).

[36] Florida v. Jimeno, 500 U.S. 248, 250 (1991).

[37] United States v. Mendez, 431 F.3d 420, 429 (5th Cir. 2005).

voluntarily given, this court employs a clearly erroneous standard.[38] This standard is particularly strong when the district judge based his findings on oral testimony at the suppression hearing,[39] as is this case here.

Voluntariness is determined by the totality of circumstances, which a court evaluates by considering six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[40]

Mata first contends that the district court erred because it failed to consider the six factors. While the district court judge did not list his findings numerically, his findings clearly indicate that he had these factors in mind.

With respect to Mata's custodial status, the district judge concluded, and testimony at both the hearing and during trial supported, that Mata's custodial status was voluntary. Mata was not under arrest and no threats were made that the police intended to arrest him. Mata was free to go as he pleased.

The judge found that the police used no coercive procedures. The police did not have their weapons drawn. During the suppression hearing, Julia Mata testified she did not recall that the officers even carried weapons. Agent Comesanas testified that no officer threatened or yelled at Mata or "treated him rudely." The testimony revealed that Mata gave verbal consent without pressure.

---

[38] Id.

[39] Id. (quoting United States v. Sutton, 850 F.2d 1083, 1086 (5th Cir. 1988)).

[40] Id.

With respect to the extent of the defendant's cooperation, Mata gave verbal consent that the officers could search, said that he had "nothing to hide," and told the officers he had guns in the safe and provided them with the combination. When the officers could not open the safe, Mata assisted them.

Regarding Mata's awareness of his right to refuse consent, the district court found that while he refused to sign the written consent form, he did not withdraw his verbal consent. When Mata said that "Maybe I should speak with my lawyer," no officer prevented Mata from calling his attorney, Agent Comesanas encouraged Mata to call, Mata had access to a cellular phone, and Mata never called. Neither did Mata request the agents provide him with an attorney. Mata contends that his statement "Maybe I should speak with my attorney" should have terminated further questions, including any further request for consent to search. As the district court found, Mata was not yet in custody or under arrest, nor had any charges been filed. The Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adverse judicial proceedings have been initiated.[41] Additionally, since Mata was not in custody, he did not require Miranda warnings.

Moreover, the court found "nothing to indicate that the Defendant, nor his wife, were in any kind of situation where they didn't understand the questions, nor their comprehension with regards to what consent mean[s]." Finally, while the district judge failed to make an explicit finding regarding Mata's belief as to the existence of incriminating evidence, the testimony of both Agent Comesanas and Julia Mata made clear that both Matas knew guns were in the safe and that they "had nothing to hide."

Mata contends that the district court improperly placed the burden on Mata, because of a statement in the concluding paragraph of the judge's findings

---

[41] Kirby v. Illinois, 406 U.S. 682, 688 (1972).

that said there was "nothing to indicate here that this was not involuntary, that it was as a result of undue pressure on the part of law enforcement officials, and also nothing to indicate that the Defendant, nor his wife, were in any kind of situation where they didn't understand the questions, nor their comprehension with regards to what consent mean[t].". This does not indicate that the district court misplaced the burden on Mata to disprove the voluntariness of the search. The government presented evidence demonstrating the voluntariness of Mata's consent, and the judge made findings from that evidence based on the six factors. If anything, the judge's statement merely reflects that after the government had proved voluntariness, Mata presented no evidence that would refute that proof.

Given the district court's factual findings and under the clearly erroneous standard, we find that the district court's conclusion that Mata and his wife gave free and voluntary consent was proper.

## III

For the reasons discussed above, we AFFIRM the district court's denial of Mata's motion to suppress evidence.

Judge Jolly joins in the judgment only.