# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 26, 2010

No. 09-40709

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MELINDA HERNANDEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
No. 5:09-CR-359-1

Before JOLLY, SMITH and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Melinda Hernandez appeals her guilty-plea conviction of harboring an illegal alien for financial gain, on the ground that evidence discovered at her residence was obtained by an unlawful search. We agree that the search of the resi-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

dence violated the Fourth Amendment. Because Hernandez's guilty plea was conditioned on her right to appeal the order denying her motion to suppress, we reverse the order denying suppression, vacate the conviction and sentence, and remand.

I.

Local police received an anonymous tip that ten to fifteen illegal aliens were being held against their will at a residential trailer owned by Hernandez. The police coordinated with federal Immigration and Customs Enforcement ("ICE") agents to investigate.

The officers and agents (collectively, "the officers") arrived at Hernandez's trailer around midnight. All was dark and quiet. The government concedes that at that time the officers did not have probable cause to obtain a search warrant, nor were there exigent circumstances to support a search.

The officers initiated a knock-and-talk investigation, announcing their presence at the front door. When they received no response, they circled the trailer and banged on doors and windows, shouting that police were present and that the occupants should open the door. After a few minutes, the officers heard movement inside. They tried to open the front door but found the outer screen door locked. Undeterred, one of them broke the glass pane of the screen door with a baton. At this point, they heard a woman––Hernandez––scream that she was coming to open the door.

Hernandez met ICE agent Fred Garza at the door. She noticed that the officers held drawn weapons, though there is no evidence that they were raised. There is a dispute about what exactly transpired at the door, but the record suggests that in a brief exchange, Garza told Hernandez about the report of several aliens' being held in the trailer. Hernandez told Garza that no one was being held against his will but also admitted––whether before or after officers entered

the home is uncertain––that at least one illegal alien, a friend, was present. The government contends that Garza asked Hernandez for permission to enter the residence and that she consented.

The officers entered and searched the trailer. They discovered her boyfriend (Sergio Guadalupe Ayala), her children, and two illegal aliens (Luis Alberto Andrade-Quezada and his nephew, Jose Moises Regalado-Soto, a fourteen-year-old minor). The officers arrested Hernandez and Ayala. Everyone waited at the trailer for about twenty to thirty minutes until Hernandez's mother could come pick up the children.

The officers took Hernandez, Ayala, Andrade-Quesada, and Regalado to an ICE office for questioning. Hernandez and Ayala were informed of their *Miranda* rights but waived them, and each made statements admitting that Hernandez had allowed Andrade-Quesada and Regalado to stay in her trailer for the previous nine days, despite knowing that they were illegal aliens. Andrade-Quesada also made a statement to that effect and indicated that he had agreed to pay Hernandez $150 per month while he and Regalado stayed with her.

Hernandez was charged with harboring an illegal alien for financial gain in violation of 8 U.S.C. § 1324 and 18 U.S.C. § 2. She moved to suppress all evidence obtained as a result of the search of her trailer, alleging that the search violated the Fourth Amendment.

The district court held a suppression hearing. At the outset, Hernandez's counsel raised the issue of the post-arrest statements made by Hernandez, Ayala, and Andrade-Quesada at the ICE office. Counsel conceded that if those statements were admissible, the motion to suppress evidence at the trailer was futile, because the government would still have sufficient evidence to convict Hernandez. Rather than decide the admissibility of the statements at the ICE office, the court elected to address the motion to suppress the trailer evidence.

After hearing testimony and arguments, the court denied the motion to

suppress. It did not address the legality of the officers' knock-and-talk methods but instead dealt exclusively with the question whether Hernandez's consent given to Garza was voluntary. The court acknowledged that, given the circumstances of Garza's request, there was a possibility that "somebody would think that they have no right to refuse entrance." Nevertheless, the court reasoned that the only out-of-the-ordinary action taken by the officers was breaking the glass on Hernandez's door. The court concluded that that action alone did not support a finding of involuntary consent.

Following the denial of her motion to suppress, Hernandez pleaded guilty. She signed a conditional plea agreement, expressly reserving the right to appeal the suppression issue.

## II.

In an appeal of a denial of a motion to suppress, we review questions of law *de novo* and factual questions for clear error. *United States v. Mata*, 517 F.3d 279, 284 (5th Cir. 2008). We may affirm on any basis established by the record. *Id.*

The district court found that Hernandez gave voluntary consent to search her trailer. The court applied our totality-of-the-circumstances test, containing six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with police; (4) his awareness of the right to refuse to consent; (5) his education and intelligence; and (6) his belief that no incriminating evidence will be found. *Id.* at 290.

Hernandez argues, however, that the district court erred by not first considering the legality of the officers' conduct before she consented to the search. We agree. When a request for consent is preceded by an illegal search or seizure, a different analysis applies. "[I]f an individual gives consent [to search]

No. 09-40709

after being subject to an initial unconstitutional search, the consent is valid only if it was an independent act of free will, breaking the causal chain between the consent and the constitutional violation." *United States v. Gomez-Moreno*, 479 F.3d 350, 357 (5th Cir. 2007).

The officers' conduct was egregious. The purpose of a knock-and-talk investigation is "to make investigatory inquiry, or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search." *Id*. at 355. "The purpose . . . is not to create a show of force, nor to make demands on occupants, nor to raid a residence." *Id*.

*Gomez-Moreno* also involved a motion to suppress the fruits of a warrantless knock-and-talk investigation that occurred after the defendant had consented to a search. A two-structure residence was suspected––without probable cause––of being used to harbor illegal aliens. Officers first announced their presence and received no response, though they could hear movement inside one of the structures and could see people through the windows in the other. The officers demanded entry and tried to open the door. A man ran outside, then back inside, the first structure. The officers followed him in, pulled him back out, and arrested him and the other occupants, including the owner of the residence. The officers gave the owner a *Miranda* warning and asked whether she was harboring illegal aliens. When she admitted that she was, the officers made threatening statements and obtained her cooperation in persuading the occupants of the second structure to come outside. The owner later signed a written consent to search.

Like the court in this case, the district court in *Gomez-Moreno* passed over the question of the officers' conduct occurring before the consent and addressed only whether the defendant's consent was voluntary. The court denied the owner's motion to suppress. We reversed:

> When officers demand entry into a home without a warrant, they have gone beyond the reasonable 'knock and talk' strategy of investigation. To have conducted a valid, reasonable 'knock and talk,' the officers could have knocked on the front door . . . and awaited a response; they might have then knocked on the back door . . . . When no one answered, the officers should have ended the 'knock and talk' and changed their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.

*Id.* at 355-56. We specifically noted the illegality of the officers' attempt to open the residence door. *Id.* at 355. We also held that the government could not argue that the suspect's exit and re-entry into the residence created exigent circumstances for the officers to conduct a search. The officers could not, through an illegal search, create the exigent circumstances that would then justify entry. *Id.* at 358.

Our holding in *Gomez-Moreno* applies almost precisely to this case. The officers' conduct during their knock-and-talk––banging on doors and windows while demanding entry, attempting a forced entry by breaking the glass on Hernandez's door, then relying on her admission that an illegal alien was present as probable cause to enter––violated the Fourth Amendment.

The district court should have acknowledged that the officers' knock-and-talk conduct was an unreasonable search. Had it done so, the court then would have proceeded not to the six-factor voluntariness analysis of Hernandez's consent, but instead to the alternative analysis of whether her consent was an independent act of free will, breaking the chain of causation between the constitutional violation and the consent. *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002). Courts consider that question by weighing three factors[1]: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of

---

[1] Our "independent act of free will" analysis is a specific application of the attenuation exception to the fruit-of-the-poisonous tree doctrine. *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

No. 09-40709

intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *Id*.

Those factors all weigh in favor of Hernandez. There was almost no time between the officers' flagrant and illegal conduct and Hernandez's consent, so there were no intervening circumstances.

In short, the motion to suppress should have been granted with respect to any evidence discovered on site at the trailer. The court then would have proceeded to the question left unanswered by the district court—whether the statements made by Hernandez and Ayala, after waiving their *Miranda* rights at the ICE office, and the statement made by Andrade-Quesada, were admissible.

Because the district court has not addressed that issue, we REVERSE the order denying suppression, VACATE the conviction (which was based on a conditional plea of guilty) and the sentence, and REMAND. We place no limitations on what proceedings should occur on remand, and we express no view on what decisions the district court should make.[2]

_____

[2] In its brief, to which Hernandez did not respond by filing a reply brief, the government makes the following argument:

> In *New York v. Harris*, 495 U.S. 14, 15-21 (1990), the Supreme Court held that a post-*Miranda* confession made at the police station after a warrantless arrest, subsequent to a warrantless, nonconsensual entry into the defendant's home, was admissible against the defendant because probable cause existed for his arrest . . . .
>
> . . . This reasoning controls the present case regardless of whether the search of Hernandez's consent to search was voluntary.
>
> . . . [A]s soon as Hernandez told Special Agent Garza at the doorway that she had at least one alien in the house, the officers had probable cause to arrest her. Therefore, assuming *arguendo* that she did not voluntarily consent to the search, her post-*Miranda* confession at the ICE station would still be admissible against her, thus effectively mooting the motion to suppress.

(Footnote omitted.) The district court is free to address this argument on remand.

7