Opinion issued July 12, 2012.



In The

# Court of Appeals

For The

# First District of Texas

————————————

NOS. 01-11-00558-CR
01-11-00559-CR

————————————

**JAMES DAVID OROSCO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1283643 & 1283645**

---

# O P I N I O N

After the trial court denied his motion to suppress, appellant, James David

Orosco, pleaded guilty to possession of marihuana in an amount of more than four

ounces, but less than five pounds,[1] and possession of a firearm by a felon.[2] In accordance with a plea agreement with the State, the trial court assessed punishment at six months' confinement on the marihuana charge and two years' confinement on the possession-of-a-firearm-by-a-felon charge. In his sole issue on appeal, appellant contends the trial court erred in denying his motion to suppress.

## BACKGROUND

A narcotics officer with the Houston Police Department informed Officer R. Watson that he suspected drug activity at 620 Reid Street in Houston, Texas. Watson is a member of the Differential Response Team, whose "focus is enforcing code violations, building inspections and other regulatory matters." The narcotics officer told Watson that he had seen several municipal code violations at the property and asked Watson to check them out. Watson and his partner, C. Schuster, drove by the property and observed three different municipal code violations. Specifically, the grass was excessively tall, the roof was unsafe, and the automated trash collection container was not stored out of public view. Based on these observed violations, Watson obtained a search warrant for the property. Watson testified that the warrant gave him the authority to enter the curtilage of the

---

[1] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121 (Vernon 2010) (trial court case number 1283643 and appellate case number 01-11-00558-CR).

[2] *See* TEX. PENAL CODE ANN. § 46.04 (Vernon 2011) (trial court case number 1283645 and appellate case number 01-11-00559-CR).

2

property to investigate further municipal violations, but did not give him the authority to enter the home on the property. Watson further testified that he decided to get the warrant because "even though we had access to the property, we found that it's better to have the warrant in case people tell you, you know, run along."

On October 30, 2010, Watson, Schuster, and at least five other officers approached the residence at 620 Reid Street at 7 a.m. When they arrived, they noticed that there was a light on inside and appellant's car was in the driveway. Watson and Schuster approached the front door to knock and announce their presence, while the other officers formed a perimeter around the house to prevent anyone inside from "jumping out the back window" and running off and to make sure "that no one walks up on us while we're conducting an investigation."

Watson testified that he "knocked and knocked and knocked and knocked," but no one came to the door. The officers around the perimeter of the house looked in the windows and saw a bong on a coffee table and also noted that there were keys inside the front lock indicating that someone was home. While surrounding the house, the police saw additional municipal violations including stacked tires on the side of the house and exposed electrical wiring. The police also noticed that the house had "the kind of low quality security cameras that [are

3

usually found] at drug dealers' houses." From one partially opened window, the officers detected the odor of marihuana.

The officers continued knocking on the door and windows intermittently for 20 to 30 minutes with no response from anyone inside. Watson testified that everyone within the house was being detained from the moment he and the other officers approached the house, and that no one was free to leave the residence until he had talked with them about the municipal code violations. After about 30 minutes of knocking, one of the officers discharged a shotgun at a threatening dog in the area. Immediately thereafter, appellant came out of the front door. He told one of the officers, "You know, y'all were laughing about [shooting at] the dog. I was afraid of what you'd do to me if I didn't come out."

The officers heard the deadbolt lock on the door after appellant stepped outside. Watson, while surrounded by three or four other officers, placed appellant in handcuffs and then asked him whether anyone else was inside the house. Appellant initially denied that there was anyone in the house, but when questioned further by Watson, appellant replied, "Yeah, yeah, you're right. My girlfriend's in the house." Watson then told appellant, "Well, you need to have her come out because I don't know how many people are in there. You've already lied to me once about there being someone else in the house. You need to have her come outside right now." Appellant talked to his girlfriend through the door and she

4

then came out on the porch. The officers had her sit in a chair on the porch because she was several months pregnant.

When appellant's girlfriend came out of the house, the officers noticed the smell of fresh marihuana and that appellant had several gang tattoos. Appellant told Watson that "he didn't want people knowing his business and he didn't want to talk around his girlfriend . . . [s]o [they] went inside to his kitchen right immediately inside the front door."

Before going inside with appellant, several of the officers did a "protective sweep" of the house. Watson did not ask permission to do the sweep, and he testified that he felt it was necessary because the officers smelled marihuana, "believed there's a high probability that someone else could be in there," saw appellant's gang tattoos, and appellant had lied once about there being no one in the house. During the protective sweep, the officers found two loaded firearms, smelled fresh marihuana, saw drug paraphernalia, and discovered a "hydroponic" marihuana growth set-up in one of the rooms. Although no marihuana was seen, there were some plant stems in pots and some other drug paraphernalia. After the 45-second sweep, the officers "pulled out waiting for either a search warrant . . . or to see if we could just talk to the defendant and he would give his consent to search." Watson then read appellant his *Miranda* rights.

Watson told appellant, "Look, what we have here is we have probable cause to get a search warrant to search this house. You can either hang out, let us go get that search warrant, or you can give us written consent now." Appellant responded that "as long as [they] kept his girl out of it, he would give written consent."

Appellant, Watson, and Schuster went inside to the kitchen, got appellant a glass of water, and spent about 20 minutes discussing the consent. Watson told appellant that if a person cooperates with a search request, it "usually works out better in their favor at the end of the investigation." Watson also told appellant, "You want me to keep your girl out of this?" To which appellant responded, "Yeah. It's not hers. You know this is my thing. She's pregnant, I want to keep her out of it." Officer Schuster testified that appellant was told that if he signed the consent, his girlfriend would not be prosecuted or arrested. However, on cross-examination Schuster clarified that appellant first brought up the issue of letting his girlfriend go, and that there was no promise of anything in exchange for signing the consent. Watson also testified that he told appellant that in return for signing the consent, he would not charge appellant's girlfriend. Watson then read appellant the consent form, explained it to him, and informed appellant that he had the right to refuse to consent. Appellant signed the form.

The police discovered a large quantity of marihuana during their subsequent search of the house.

## MOTION TO SUPPRESS

Appellant contends the trial court erred in denying his motion to suppress based on his execution of the consent form.  Specifically, appellant contends that his consent was involuntary because (1) the warrant giving police the right to enter the curtilage of his property was invalid; (2) he was constructively seized in his home when police surrounded his home and knocked on the door and window for 30 minutes before discharging a weapon, which caused him to involuntarily leave his home; (3) the police conducted an illegal "protective sweep" of his home; and (4) the police illegally induced his consent by promising to "keep his girl" out of it if he cooperated and signed the consent.

### Standard of Review

In reviewing the trial court's ruling on the motion to suppress evidence, we apply a bifurcated standard of review, giving "almost total deference to [the] trial court's determination of historical facts" and reviewing de novo the court's application of the law of search and seizure to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997)). If the issue involves the credibility of a witness, such that the demeanor of the witness is important, then greater deference will be given to the trial court's ruling on that issue. *Guzman*, 955 S.W.2d at 87. In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the

credibility of the witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Accordingly, the trial court may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted. *Id.* We will uphold the trial court's ruling on a motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case. *Id.* at 856.

As here, when the trial court files findings of fact with its ruling on a motion to suppress, an appellate court does not engage in its own factual review, but determines only whether the record supports the trial court's fact findings. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). Unless the trial court abused its discretion by making a finding not supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991). On appellate review, we address only the question of whether the trial court properly applied the law to the facts. *Romero*, 800 S.W.2d at 543.

**Consent**

Under the Fourth and Fourteenth Amendments to the United States Constitution, a search conducted without a warrant is *per se* unreasonable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973). Consent to search is one of the well-established exceptions to the

constitutional requirements of both a warrant and probable cause. *Id.* at 219; *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010). The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily. *Gutierrez v. State*, 221 S.W.3d 680, 686—87 (Tex. Crim. App. 2007). This burden includes proving that consent was not the result of duress or coercion. *Id.* Consent is not established by showing no more than acquiescence to a lawful authority. *Carmouche*, 10 S.W.3d at 331 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788 (1968)). To determine whether the State met its burden, we look at the totality of the circumstances. *Gutierrez*, 221 S.W.3d at 686—87. If the record supports a finding by clear and convincing evidence that consent to search was free and voluntary, we will not disturb that finding. *Carmouche*, 10 S.W.3d at 331. Whether it is reasonable under the Fourth Amendment for an officer to rely on consent is a question which we determine by examining the totality of the circumstances. *Hubert*, 312 S.W.3d at 560; *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). If police obtain evidence as the result of a consensual search during an illegal seizure, a defendant may have the evidence suppressed unless the State proves that the causal relationship between the police misconduct and the defendant's consent is attenuated—that is, the illegal seizure did not taint the otherwise voluntary consent. *Brick v. State*, 738 S.W.2d 676, 681

9

(Tex. Crim. App. 1987); *Munera v. State*, 965 S.W.2d 523, 532 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

Thus, before we determine whether appellant's consent was voluntary, we must first address his allegations of police misconduct. The State argues that the search warrant gave them authority to enter the curtilage of appellant's property, and that thereafter they had the authority to detain appellant to further investigate the municipal violations the officers had observed. Appellant responds that (1) the warrant was invalid, thus the officers had no right to encroach on his property any further than the front door, and (2) even if the warrant was valid and the officers had the right to detain him, they could not enter his home to do so without a warrant, nor could they coercively induce him to exit the property so as to effectuate a warrantless arrest outside the home.

No evidence was obtained as a result of the search warrant and the State did not rely on the warrant to seize the evidence in appellant's home, but instead relied on appellant's consent. Thus, we do not address the validity of the warrant. Instead, we accept that the warrant gave police the right to enter the curtilage of appellant's property and consider what effect, if any, their entry and continued presence on the property after concluding their search outside the residence had upon appellant's subsequent consent to search inside the residence.

10

**Product of Illegal Detention**

Appellant contends that he was illegally seized within his home when six to seven armed police officers surrounded his house before daylight, knocked repeatedly on doors and windows for 20 to 30 minutes, and then discharged a shotgun nearby. Appellant argues that his decision to exit the house was not voluntary, thus his seizure was a violation of *Payton v. New York*, 445 U.S. 573, 586—88, 100 S. Ct. 1371, 1380—81 (1980), which prohibits a warrantless arrest inside a home absent exigent circumstances even if probable cause for such an arrest exists. Appellant further contends that the "protective sweep" and his consent to search were tainted by this initial illegal seizure.

The Fourth Amendment to the United States Constitution and article 1, section 9 of the Texas Constitution protect individuals from unreasonable searches and seizures. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; *Johnson v. State*, 912 S.W.2d 227, 232 (Tex. Crim. App. 1995). A search or seizure conducted inside a home without a warrant issued upon probable cause is presumptively unreasonable. *See Payton*, 445 U.S. at 586, 100 S. Ct. 1371. The "right of a man to retreat into his own home and to be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment." *Green v. State*, 78 S.W.3d 604, 608—09 (Tex. App.—Fort Worth 2002, no pet.) (citing *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 683 (1961)). However, a police officer, like any common

11

citizen, has the right to approach the front door of a residence and knock, as long as there are no express orders forbidding trespass. *See Cornealius v. State*, 900 S.W.2d 731, 734 (Tex. Crim. App. 1995).

Here, the State argues that "[a]s the subject of a lawful detention, appellant was not free to simply remain in his house and ignore or hide from police, whom he knew were outside wanting to speak to him." Essentially, the State argues that because the officers had reasonable suspicion to detain appellant for the municipal code violations, he was required to open the door to them. This is clearly not the law. A defendant is entitled to remain in his home, and police officers cannot enter to effectuate an arrest without exigent circumstances, even if they have probable cause to do so. *See Payton*, 445 U.S. at 586. The more difficult question we address for the first time today is whether police conduct can, in the face of a defendant's refusal to exit his home, be considered an illegal arrest in violation of *Payton* if the officers create circumstances indicating to the defendant that he must exit the home. In such a case, the police have not breached the threshold of the home, but their conduct has nonetheless coerced the defendant to exit the home where he is then subject to warrantless detention or arrest.

Appellant cites no Texas cases to support his position, but several federal courts have found coercive conduct by police outside the home, which causes a

defendant to believe that he must exit the home, to be an "illegal seizure" in violation of *Payton*.

In *United States v. Reeves*, 524 F.3d 1161, 1164 (10th Cir. 2008), police officers went to a motel where the defendant, an assault suspect, had been living for three months. At 2:43 a.m., the police asked the motel manager to call the defendant's room, which the manager did repeatedly. *Id.* Appellant did not answer the phone. *Id.* The officers then went to the defendant's room, where they "knocked consistently for at least twenty minutes while yelling and identifying themselves as police officers." *Id.* After approximately twenty minutes of banging and yelling, the defendant opened the motel room door, stepped outside, and was then arrested. *Id.* On appeal, he argued that he was arrested inside his home in violation of the Fourth Amendment and that the evidence subsequently obtained was tainted and should be suppressed. *Id.* at 1165. The Seventh Circuit agreed, holding that "[a] reasonable person faced with several police officers consistently knocking and yelling at their door for twenty minutes in the early morning hours would not feel free to ignore the officers' implicit command to open the door." *Id.* at 1169. The court concluded that "when Reeves answered his door he did so in response to a show of authority by the officers and he was seized inside his home." *Id.* In so holding, the court noted that "opening the door to one's home is not voluntary if ordered to do so under color of authority," and that "if an individual's

decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *Id.* at 1168.

In *United States v. Morgan*, 743 F.2d 1158, 1161 (6th Cir. 1984), nine armed police officers surrounded the defendant's mother's home, flooded it with spotlights, and used a bullhorn to "summon" the defendant outside. *Id.* at 1161. On appeal, the State argued that the officers had reasonable suspicion upon which to detain the defendant, thus their actions were reasonable in effectuating that detention. *Id.* at 1164. The court disagreed, stating that "the police conduct outside of the Morgan home cannot be characterized as a brief investigatory stop," and that the defendant was under arrest "as soon as the police surrounded the Morgan home, and therefore, the arrest violated *Payton* because no warrant had been secured." *Id.* "The police show of force and authority was such that a 'reasonable person would have believed he was not free to leave.'" *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980)). Noting that (1) nine officers and several patrol cars surrounded Morgan's residence; (2) in the dark; (3) blocked any movement of Morgan's car; and (4) called for Morgan to come out, the court concluded that "Morgan was placed under arrest, without the issuance of a warrant, at the moment the police encircled the Morgan residence." *Id.*

14

In *United States v. Gomez-Moreno*, 479 F.3d 350, 352 (5th Cir. 2007), the court considered a similar case involving a "knock-and-talk" investigation during which the suspects inside the house initially refused to respond to the officers. In *Gomez-Moreno*, the court stated that "the purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence. Instead, the purpose of a 'knock and talk' approach is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search." *Id.* at 355. The court then analyzed whether a proper "knock and talk" had occurred.

> Here, the officers did not engage in a proper "knock and talk" but instead created a show of force when ten to twelve armed officers met at the park, drove to the residence, and formed two groups—one for each of the two houses—with a helicopter hovering overhead and several officers remaining in the general area surrounding the two houses. When no one responded to the officers' knocking, the officers impermissibly checked the knob on the door to the front house to determine if it would open, and simultaneously, at the back house, announced their presence while demanding that the occupants open the door. When officers demand entry into a home without a warrant, they have gone beyond the reasonable "knock and talk," strategy of investigation. To have conducted a valid, reasonable "knock and talk," the officers could have knocked on the front door to the front house and awaited a response; they might have then knocked on the back door or the door to the back house. When no one answered, the officers should have ended the "knock and talk" and changed their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance. Here, however, the officers made a show of force, demanded entrance, and raided the residence, all in the name of a "knock and talk."

*Id.* at 355–56. Having exceeded the scope of a valid "knock and talk," the court then considered whether there were exigent circumstances to justify the subsequent search and concluded there were not. *Id.*

In another Fifth Circuit case, the court considered whether the officers' conduct during a "knock and talk" was, in and of itself, a violation of the Fourth Amendment. In *United States v. Hernandez*, 392 F. App'x 350, 351 (5th Cir. 2010), police initiated a knock and talk and announced their presence at the defendant's front door. When they received no response, police circled the defendant's trailer banging on doors and windows, shouting that police were present and anyone inside should open the door. *Id.* When the police heard movement inside, they tried to open the front door, with one of the police actually breaking a glass pane with his baton. *Id.* The defendant then exited the home and subsequently gave police permission to enter the home. *Id.* The officers entered the trailer, found illegal aliens, and subsequently charged the defendant with harboring an illegal alien for financial gain. *Id.* The court held as follows:

> The officers' conduct during their knock-and-talk—banging on doors and windows while demanding entry, attempting a forced entry by breaking the glass on Hernandez's door, then relying on her admission that an illegal alien was present as probable cause to enter—violated the Fourth Amendment.

*Id.* at 353. The court then stated that the proper analysis was not whether the defendant's consent to search was voluntary, but whether there was a break in the

16

chain of causation between the constitutional violation and her consent. *Id.* The court concluded that there was no attenuation of the taint from the initial constitutional violation and that the defendant's motion to suppress should have been granted. *Id.*

Under the reasoning of *Gomez-Moreno*, *Reeves*, *Morgan*, and *Hernandez*, we conclude that police cannot use an unreasonable show of force during a "knock and talk" to compel a defendant to open his door to police. When a person in his home declines to speak to police, the officers should retreat cautiously, seek a search warrant, or conduct further surveillance. *See Gomez-Moreno*, 479 F.3d at 352.

Thus, we must decide whether in this case an unreasonable show of force compelled appellant to exit his home. Here, seven police officers entered appellant's property before daylight on a Saturday morning to execute a search warrant for municipal code violations.[3] After noting several municipal violations, the police did not leave, but maintained their perimeter around appellant's home while they attempted to make contact with appellant about the municipal code violations. Two officers approached the front door, while the others remained in their positions around the house. Officer Watson testified that the perimeter was necessary because "we've had it happen before that you go to knock on

---

[3]     As stated earlier, for purposes of this opinion, we will assume without deciding that the warrant was valid and gave the officers the right to enter the property.

17

somebody's front door regarding high weeds and they're jumping out the back window running because of something else they've done." Watson also testified that, based on where the officers were positioned, no one was able to leave the residence. Watson knocked on the front door intermittently for 20 to 30 minutes. While he was at the front door knocking, some other officers were knocking on windows. During this 20 to 30 minute period, no one came to the door, although officers believed that appellant was inside. Officers Watson and Schuster also testified that at no time was appellant free to leave.

Defense Counsel: Officer, at any point was Mr. Orosco free to leave?

Watson: No. He was being detained.

Defense Counsel: He was being detained. ***That includes even at the moment you approached the residence, correct?***

Watson: Yes. He was going to be detained till we got done talking about the reason why we came.

＊ ＊ ＊ ＊

Defense Counsel: Based on the officer's positions and you and your partner's position, was anybody free to enter or leave that residence?

Schuster: Well, we hadn't made contact with anybody. So, no. How could they be free to leave if we hadn't talked to anybody?

Defense Counsel: Well, my question specifically is, from that home, was anybody free to come in or leave that home at that point. Would they have been able to leave that residence without you intervening?

Schuster: No.

18

After 20 to 30 minutes of knocking on the door and windows with no response from appellant, an officer who was positioned behind the house discharged a shotgun at a neighbor's dog. Appellant then came out of the house and was immediately handcuffed. He told Officer Schuster, "You know, y'all were laughing about [shooting] the dog. I was afraid of what you'd do to me if I didn't come out."

"Opening the door to one's home is not voluntary if ordered to do so under color of authority." *Reeves*, 524 F.3d at 1167. "If an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *Id.* "A reasonable person faced with several police officers consistently knocking and yelling at their door for twenty minutes in the early morning hours would not feel free to ignore the officers' implicit command to open the door." *Id.*

Under these circumstances, it cannot be said that appellant voluntarily exposed himself to a warrantless arrest by leaving the confines of his home. After searching the property before daylight, seven officers surrounded the home, knocked on doors and windows for 20 to 30 minutes, and discharged a weapon before appellant exited the house. As the officers themselves testified, they were not leaving the premises, nor allowing anyone else to enter or leave the premises, until appellant answered the door and responded to their questioning. In effect,

19

appellant's home was under siege when he finally consented to come outside. Because he answered the door in response to an unreasonable show of authority by the officers, he was unconstitutionally seized at that time. *See Hernandez*, 392 F. App'x at 353; *Reeves*, 524 F. 3d at 1169. Thus, we turn to the issue of whether appellant's subsequent consent to search was sufficiently attenuated from his unconstitutional seizure.

**Attenuation of Taint**

To establish the validity of consent after an illegal search or seizure, the State must prove by clear and convincing evidence that the taint inherent in the illegality had dissipated by the time consent was given. *Brick v. State*, 738 S.W.2d 676, 680–81 (Tex. Crim. App. 1987); *accord Leal v. State*, 773 S.W.2d 296, 297 (Tex. Crim. App. 1989). In that respect, we consider (1) the temporal proximity between the unlawful seizure and the given consent; (2) whether the warrantless seizure brought about police observation of the particular object for which consent was sought; (3) whether the seizure resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether appellant was made fully aware of the right to refuse consent; and (6) whether the police purpose underlying the illegality was to obtain the consent. *See Brick*, 728 S.W.3d. at 680–81.

The record shows that appellant gave his consent to search immediately after he was illegally seized. "The close temporal and spatial proximity of the consent to the illegal conduct makes the first factor favorable to appellant." *Beaver v. State*, 106 S.W.3d 243, 250 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Immediately after appellant's warrantless seizure, the police conducted a protective sweep of the house. During this sweep, the police noticed two weapons and a marihuana growth set-up. Once police saw this, they withdrew from the premises to obtain either a warrant or consent for a more thorough search. But for appellant's warrantless seizure, police would not have conducted the protective sweep, which led to the discovery of the items for which the police ultimately sought consent to search. The second factor favors appellant.

The third factor is more problematic. Courts usually do not deem police misconduct as "flagrant" unless the illegal conduct was engaged in for the purpose of obtaining consent, or the police misconduct was calculated to cause surprise or fear. *Id.,* (citing *Brown v. Illinois*, 422 U.S. 590, 605, 95 S. Ct. 2254, 2262 (1975) (holding that police misconduct had a "quality of purposefulness," and was "calculated to cause surprise, fright, and confusion."); *Garcia v. State,* 3 S.W.3d 227, 243 (Tex. App.—Houston [14th Dist.] 1999, pet. granted) (stating that police conduct is flagrant if it is for the purpose of obtaining the consent) *aff'd,* 43 S.W.3d 527 (Tex. Crim. App. 2001); *Renfro v. State,* 958 S.W.2d 880, 886 (Tex.

21

App.—Texarkana 1997, pet. ref'd) (no flagrant conduct where police did not calculate to cause surprise or fear)). Here, police officers testified that their purpose in circling the house and banging on doors and windows for 20 to 30 minutes was to investigate the municipal code violations that they had seen, as well as the drug paraphernalia they had seen through the windows and the marihuana they had smelled. Their purpose, though illegal, was to force appellant from his house so that they could discuss these matters with him. According to their testimony, their purpose did not change to seeking consent to search until after they performed a protective sweep of the house. However, it is also probable that their conduct was "calculated to cause surprise, fright, and confusion." Multiple officers approached appellant's home before daylight and began knocking on doors and windows before finally firing a shotgun. We conclude that factor three is neutral.

The police requested consent to search. This fourth factor favors appellant.

Appellant was made fully aware, both orally and in writing, of his right to decline consent. This fifth factor favors the State.

The sixth factor requires us to consider whether the police purpose underlying the illegality was to obtain the consent to search. As stated in our discussion of the third factor, the police testified that their purpose in forcing appellant to leave his home was to discuss the municipal code violations they had

seen, as well as the drug paraphernalia and the odor of marihuana. The police testified that they did not form an intent to seek consent to search the house until the protective sweep of the house. The sixth factor favors the State.

Only two of the six factors favor the State, thus we conclude that the State has not met its burden of showing that the taint of appellant's illegal seizure was sufficiently attenuated from his subsequent consent to search. Thus, the trial court erred in denying appellant's motion to suppress.

We sustain appellant's sole issue on appeal.

## CONCLUSION

We reverse the judgment of the trial court and remand for further proceedings.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Publish. TEX. R. APP. P. 47.2(b).