In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00314-CR**
_____

**THE STATE OF TEXAS, Appellant**

**V.**

**DAVID ALLEN STANLEY II, Appellee**

**On Appeal from the 258th District Court**
**Polk County, Texas**
**Trial Cause No. 23,727**

## MEMORANDUM OPINION

The State brings this interlocutory appeal from a trial court order granting David Allen Stanley II's (Stanley or Appellant) motion to suppress certain evidence obtained pursuant to a warrantless search of his home. We affirm.

PROCEDURAL BACKGROUND

On November 14, 2014, Stanley was indicted for "intentionally or knowingly possess[ing] a controlled substance, namely Methamphetamine, of less than one gram[.]" On April 8, 2015, Stanley filed a "Motion to Suppress Illegal

Arrest[,]" (hereinafter motion or Motion to Suppress) arguing that the search of his property was "without lawful warrant, probable cause or other lawful authority" in violation of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as provisions of the Texas Constitution, and under Article 38.23 of the Texas Code of Criminal Procedure, and that all evidence and statements obtained pursuant to the search should be suppressed. The motion sought suppression of the following items of evidence obtained from Stanley's house:[1]

> (1) Methamphetamine pipe with white and brown substance on coffee table, (2) Marijuana in ash tray on coffee table, (3) 8 Ball Marijuana Grinder on coffee table, (4) Black tray of marijuana, pipe used to smoke marijuana under far right corner of couch, (5) Digital scale under couch, (6) silver color pipe on book shelf to [t]he right of the couch *left on scene*, (7) Marijuana on small bowl on book shelf to the right of the couch, (8) Glass jar with marijuana on desk in living-room[.]

The trial court conducted a hearing on the Motion to Suppress on July 22, 2015. At the close of the hearing, the trial court granted the motion as to each of the eight

---

[1] In the same Motion to Suppress, Stanley also sought to suppress three items found in the garage, and approximately twenty items found in the travel trailer located on Stanley's property. The trial court denied the motion with respect to all items obtained from the garage and the travel trailer. Stanley does not challenge the trial court's ruling with respect to those items. Therefore, we need not discuss those items in our opinion. Tex. R. App. P. 47.1.

items obtained from Stanley's house, and denied the defendant's motion as to all other items. The State appeals.

EVIDENCE PRESENTED AT THE SUPPRESSION HEARING

Testimony of Stanley

At the hearing, Stanley testified that on or about May 13, 2014, he and his girlfriend were asleep in the back room of his house when he heard a knock on the door. Stanley explained that "the sheriff's department" was at the door and that Detective Christopher Lima (Lima) pulled Stanley outside and asked him whether anyone else was in the house with him. Stanley said he told Lima that his girlfriend Brittany Plank (Plank) was in the house asleep.[2] According to Stanley, Plank did not live in the house but she did spend the night there "regularly." Stanley testified that Lima and the other officers with Lima told Stanley they were looking for Matt Reed (Reed) pursuant to a Crime Stoppers tip, and that none of the officers showed Stanley a search warrant or arrest warrant.

Stanley explained that multiple buildings are on his property, including the house, a garage, a shop, and a "camper trailer" (trailer) behind the shop, and that Reed was a friend who Stanley allowed to stay in the trailer. According to Stanley,

---

[2] Stanley's Motion to Suppress refers to Brittany Plank, Bobbie Joe Sweeney, and Matt Reed as "co-defendants/persons[.]" Plank, Sweeney, and Reed are not parties to this appeal.

the trailer was "[p]robably 75, 80 yards[]" from the front door of Stanley's house. Stanley testified that after he told the officers Reed was in the trailer, two of the officers went toward the trailer.

Stanley further explained that when he told Detective Lima that Plank was in the house, the Detective went into the house, got Plank out of bed, and came out of the house with Plank. Stanley testified that, at this point, he had not given consent for any officer to go into his house. According to Stanley, Stanley was cooperative and did not have a weapon, he did not hear Plank yelling or making threats, and as far as he knew, the only reason the officers were at the house was a tip regarding drugs and Reed. When asked if there would have been any reason for law enforcement to go into his house, Stanley replied "No, sir."

Stanley explained that after Lima came out of the house with Plank, Lima went back inside the house along with Deputy William Jerry (Jerry), although Stanley testified that he had not given consent for Jerry to enter the house. According to Stanley, at some point, Jerry took Stanley down the driveway to sit on the tailgate of Stanley's truck and two other officers went past them with Reed. Stanley testified that, at that point, he did not feel free to go back into his house or to leave. Stanley explained that he believed he had done nothing to cause the

4

officers to detain him and that he and Officer Jerry were just sitting on the tailgate of Stanley's truck having "general conversation."

According to Stanley, after the officers put Reed in the back of one of the officers' vehicles, Officer Lowrie asked Stanley if Stanley would sign a consent to search. Stanley testified as follows:

> [Stanley]: . . . I turned around and looked up at my house and just kind of smiled. I said, it's late for that, ain't it? Because there were already two officers in my house. And I told him, yes, sir, I'll sign it so y'all don't tear my house up.
>
> [Defense attorney]: Okay. So at that point when you signed the consent, they had already entered [the] house?
>
> [Stanley]: Yes, sir.
>
> [Defense attorney]: At least two officers?
>
> [Stanley]: Yes, sir.
>
> [Defense attorney]: All right. And again[,] at no point you gave him permission to go into the house?
>
> [Stanley]: No, sir, not -- not before that.

Stanley agreed that he "voluntarily signed [a consent form] to keep them from tearing up [his] house because . . . they were already in [his] house anyway[,]" and he agreed that he did not think the police coerced or threatened him into signing the consent form:

5

[State's attorney]: So, Mr. Stanley, did at any point did anybody ever point a gun at you?

[Stanley]: No, sir.

[State's attorney]: Did it -- you stated before -- before the consent to search form had been signed, you were actually able to sit on the tailgate of your truck and speak with Detective William Jerry?

[Stanley]: Yes, sir.

[State's attorney]: Okay. Was he threatening you while he was talking to you?

[Stanley]: No, no. We were talking about previous incidents and just conversating. Just general conversation.

[State's attorney]: Okay. Did you ever have any conversations with any of the officers out there that day that you thought was threatening?

[Stanley]: No, sir.

[State's attorney]: Do you think they coerced you in any way to sign the consent form?

[Stanley]: No, sir, they -- like I said, I signed the consent form because they were already in my house.

Stanley testified that he did not read the consent form before he signed it, but that the police told him "it was a consent to search." According to Stanley, the police discovered items inside his house prior to Stanley signing the consent-to-search form and the items that the police discovered were not in plain view from the front of the doors to his house when the doors were closed. Stanley testified that Officer

6

Lowrie told him that if Stanley did not want to sign the consent form, the officers could get a warrant.

### Testimony of Lieutenant Anthony Lowrie

Lieutenant Anthony Lowrie (Lowrie) testified that he works with the narcotics division of the Polk County Sheriff's Office. Lowrie explained that he and three other officers went to Stanley's residence on May 13, 2014, without a search warrant to conduct a "knock and talk[,]" which Lowrie explained as follows:

> We get a tip. It's not enough to go get a search warrant on. We go approach the residence, knock on the door and see if the people inside would be willing to talk to us, see if they would be willing to give consent to clear up the tip, things of that nature.

According to Lowrie, the Polk County Sheriff's Office had received a Crime Stoppers tip "about Matt Reed at David Stanley's residence[.]" Lowrie explained that when officers conduct a "knock and talk," they typically try to get all the occupants out of the house for "officer safety reasons" and so officers can talk with all the occupants at the same time. According to Lowrie, officers also request a consent to search from "[a]nybody that lives in the residence[.]" Lowrie testified that he heard Stanley give Detective Lima "permission to walk inside the house to get Ms. Plank and bring her back outside or ask[] her to come outside." According to Lowrie, Plank did not make any threats or threatening movements and she was

7

not yelling. Lowrie also agreed that, at any point prior to the consent to search, Stanley was free to go back inside the house or to leave.

Lowrie stated that he did not say anything to Stanley about the tip received, but he did ask Stanley where Reed was, and Stanley responded that Reed was living in the trailer behind Stanley's garage. According to Lowrie, he and Detective Schanmeyer walked to the trailer, knocked on the door, and Reed opened the door. At some point thereafter, Reed and "the female subject" were both placed in handcuffs. Lowrie testified that he observed some items in plain view when he knocked on the door of the trailer. Lowrie testified that his interaction with Stanley was "maybe a minute or two[]" prior to Lowrie walking to the trailer.

Lowrie indicated that Detective Lima asked Stanley for consent to search Stanley's residence, Stanley agreed, and Lima started filling out the consent form, and Lowrie signed the form as a witness. Lowrie agreed that the consent-to-search form covers the property address, the trailer, and the garage. Lowrie also testified that all three subjects who signed the consent-to-search form read it before signing it.[3]

---

[3] The consent-to-search form was admitted into evidence without objection, and it contains signatures for David Stanley, Brittany Plank, and Matt Reed. The State did not argue at the hearing, nor does it argue on appeal, that consent by Plank or Reed constituted valid consent to search Stanley's house.

Lowrie agreed that it was undisputed that Lima went into Stanley's house prior to Stanley signing the consent-to-search form. Lowrie further indicated that Lima said he had seen a "meth pipe" in plain view on the coffee table in the residence while he was escorting Plank out of the house, and that at that point, Lima had not initiated a search of the house. Lowrie read the following from his incident report: "While escorting the two to the front of the residence, Lieutenant Lowrie was advised by Detective Lima that he observed in plain view a methamphetamine pipe with a white-brown substance sitting on the coffee table in the main residence."[4]

Written "Consent to Search"

A document entitled "Consent to Search[,]" signed by Stanley, Plank, and Reed, dated May 13, 2014, was admitted into evidence at the Motion to Suppress hearing. The "Consent to Search" document states that Stanley, Plank, and Reed consented to allow Detective Lima

> . . . and any other Officers working with him to conduct a complete search of the following premises, building and vehicles located in Polk County, Texas, at and namely: 2747 FM 3277[,] Livingston, Texas/Camper Trailer & Garage and to seize and take therefrom any item of personal property they may believe to constitute evidence in a criminal proceeding.

---

[4] The record does not include a copy of Detective Lowrie's incident report.

The "Consent to Search" document expressly states that the signers have been informed by a Texas Peace Officer of their "Constitutional right to be free from having him or other Officers make a warrantless search" and of the "Constitutional right to refuse to give him or any other Officer consent to make such a search[.]" The form further states:

> I have given this consent of my own free will and accord and without being subjected to any threats, promises, compulsion or persuasion of any kind. I know that any item of personal property seized by the above named Officer or other Officers with him and taken by them from such premises can and will be used against me in a criminal proceeding.

### Order Granting in Part and Denying In Part Motion to Suppress

At the close of the hearing, the trial court explained:

> . . . I believe the Court feels like that [sic] the consent for the search of the house was obtained improperly. However, the consent for the search of the garage and the search of the trailer appear to be proper. So I'm going to grant the suppression as to the house search, but not as to the search of the garage. And, of course, there's no question here today about the trailer. . . .

The trial court signed an order granting the Motion to Suppress as to the eight items obtained from the house and denying the motion as to all other items. The State requested that the trial court enter findings of fact and conclusions of law, and the trial court entered an order stating the trial court would enter such

findings. The State timely appealed. After the appeal was abated, the trial court entered Findings of Fact and Conclusions of Law as follows:[5]

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Findings of Fact

1. On May 13, 2014, Polk County Sheriff's Department Deputies went to the residence of David Allen Stanley, III, [sic] defendant, on a Crime Stoppers tip concerning Matt Reed at 2747 FM 3277 in Livingston, Polk County, Texas.

2. Deputy Lima, Polk County Sheriff's Department, knocked on defendant's door. Officer allegedly pulled defendant out of the door and set him on a stool.

3. Deputy Lima asked defendant if anyone was in the house and defendant said Brittany Plank, girlfriend was in the house asleep, not Matt Reed.

4. Deputy Lima told defendant he was looking for Matt Reed due to [a] Crime Stoppers tip. No Warrant was presented.

5. There were 3 buildings on the premises of defendant.

6. Deputy Lima went into the defendant's house without permission twice.

7. Deputy William Jerry also went into the house, without consent of defendant.

8. Defendant felt like he was restrained.

9. Finally one deputy asked defendant for consent to search house.

---

[5] We omit herein the record references to the Reporter's Record that the trial court included in its Findings of Fact and Conclusions of Law.

11

10. Matt Reed, alleged suspect was in travel trailer behind defendant's house.

11. Search of defendant's residence occurred before defendant signed consent form.

12. Defendant felt detained when he went to answer the door.

13. Officer advised defendant if he did not sign consent, they could get a Search Warrant.

14. Tip concerned Matt Reed.

15. Defendant shut door behind him when he answered the officer's knock on his door.

## Conclusions of Law

1. Consent to Search defendant's home was invalid and fruits of illegal search were obtained by illegal search and seizure.

2. Consent to search garage/shop and second residence of Matt Reed was not an issue before the court.

## ISSUE ON APPEAL

In a single issue, the State argues that the evidence obtained from Stanley's house was admissible because Stanley voluntarily gave consent to search. The State argues that it proved by clear and convincing evidence that Stanley's consent was voluntary because he was not detained or arrested when he gave consent, because he had been informed he had the option to refuse consent, because law enforcement had not coerced or threatened him, and because the consent form

12

stated it was signed voluntarily and it "contained constitutional advice, specifically that the Appellee had been warned that he had the right to be free from a warrantless search [and] that he could refuse to give consent to search." Stanley argues that law enforcement searched his house without a warrant and without his consent. He further argues that any evidence obtained as a result of the search of his house was properly excluded as "fruit of the poisonous tree[.]"

JURISDICTION

The State has limited rights of appeal in criminal cases. *See* Tex. Code Crim. Proc. Ann. art. 44.01 (West Supp. 2015). In a criminal case, the State may appeal a trial court's order granting a motion to suppress evidence provided jeopardy has not attached and provided the prosecutor certifies to the trial court that the appeal is not taken for the purpose of delay and that the suppressed evidence is of substantial importance to the case. *Id.* art. 44.01(a)(5). In this matter, the record reflects that the district attorney for Polk County personally signed the notice of appeal wherein he certified that "this appeal is not taken for the purpose of delay, and that the evidence suppressed by the order of the court is of substantial importance in this cause." Nothing in the record before us indicates that jeopardy has attached, and Stanley does not argue this point in his appellate brief. Therefore,

13

we conclude we have jurisdiction over this interlocutory appeal by the State. *See State v. Redus*, 445 S.W.3d 151, 154-55 (Tex. Crim. App. 2014).

STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016); *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). "We review the trial court's factual findings for an abuse of discretion[.]" *Turrubiate*, 399 S.W.3d at 150. We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of the credibility and demeanor of the witnesses. *See Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). The same deference is afforded the trial court with respect to its rulings on the application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of the credibility and demeanor of witnesses. *Id.* For mixed questions of law and fact that do not fall within that category, a reviewing court conducts a de novo review. *Id.*; *Kothe v. State*, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004).

At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Maxwell v. State*, 73 S.W.3d 278, 281

14

(Tex. Crim. App. 2002). A trial court may choose to believe or to disbelieve all or part of a witness's testimony at the hearing. *See Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013) (citing *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). Issues of consent are "necessarily fact intensive" and, as a result, "a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous." *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011). The prevailing party in the trial court "'is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.'" *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)).

When the trial court grants a motion to suppress and files accompanying findings of fact and conclusions of law, and the State has not contested the trial court's findings of fact, the only question before us is whether the trial court properly applied the law to the facts it found. *See State v. Gray*, 158 S.W.3d 465, 467, 469 (Tex. Crim. App. 2005); *Guzman v. State*, 955 S.W.2d 85, 86-87, 89 (Tex. Crim. App. 1997). We view the evidence in a light most favorable to the trial court's rulings and we must uphold the trial court's ruling on a motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*,

15

541 U.S. 974 (2004); *See Arguellez v. State*, 409 S.W.3d 657, 662-63 (Tex. Crim. App. 2013).

CONSENT-TO-SEARCH EXCEPTION TO WARRANT

Both the United States and Texas Constitutions protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9; *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) ("At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *Johnson v. State*, 912 S.W.2d 227, 232 (Tex. Crim. App. 1995). Under the Fourth and Fourteenth Amendments to the United States Constitution, a search conducted without a warrant is *per se* unreasonable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Villarreal*, 475 S.W.3d 784, 795 (Tex. Crim. App. 2014), *cert. denied*, *Texas v. Villarreal*, No. 15-1063, 2016 U.S. LEXIS 4290 (June 28, 2016); *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011) ("'[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.'") (quoting *Camara v. Mun. Court*, 387 U.S. 523, 528-29 (1967)).

16

A defendant who alleges a violation of the Fourth Amendment has the burden of producing evidence that rebuts the presumption of proper police conduct. *State v. Robinson*, 334 S.W.3d 776, 778-79 (Tex. Crim. App. 2011) (citing *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009)). He may carry this burden by establishing that the seizure occurred without a warrant. *Id.* at 779. The burden then shifts to the State to prove the reasonableness of the seizure. *Id.*

Consent to search is one of the well-established exceptions to the constitutional requirements of both a warrant and probable cause. *Schneckloth*, 412 U.S. at 219; *Meekins*, 340 S.W.3d at 458; *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010). The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily. *See Gutierrez v. State*, 221 S.W.3d 680, 686 (Tex. Crim. App. 2007); *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000) ("'voluntariness is a question of fact to be determined from all the circumstances[]'") (quoting *Ohio v. Robinette*, 519 U.S. 33, 40 (1996)). Generally, "'whether consent is voluntary turns on questions of fact and is determined from the totality of the circumstances.'" *Rodriguez v. State*, 313 S.W.3d 403, 406 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (quoting *Johnson v. State*, 226 S.W.3d

439, 443 (Tex. Crim. App. 2007)); *see also Rayford v. State*, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003) (citing *Robinette*, 519 U.S. at 40; *Maxwell*, 73 S.W.3d at 281). The ultimate question is whether the person's "'will ha[s] been overborne and his capacity for self-determination critically impaired,'" such that his consent to search must have been involuntary. *Meekins*, 340 S.W.3d at 459 (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)).

Among the factors to be considered in determining voluntariness include the youth, intelligence, or education of the person, the constitutional advice given to the person, the length of the detention, the repetitiveness of the questioning, and the use of physical punishment. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). Other factors courts may consider include, but are not limited to, the following: whether the person giving consent was in custody, whether *Miranda* warnings were given, and whether police officers threatened to obtain a search warrant if the person did not consent. *See Meekins*, 340 S.W.3d at 463 n.44 (citing *Frierson v. State*, 839 S.W.2d 841, 851 (Tex. App.—Dallas 1992, pet. ref'd); *State v. Williams*, 312 S.W.3d 276, 284 (Tex. App.—Houston [14th Dist.] 2010, no pet.)).

A written consent to search tends to show that consent was definite and unequivocal. *See Lackey v. State*, 638 S.W.2d 439, 452 (Tex. Crim. App. 1982).

Generally, a person will consider a decision with more care and deliberation if he signs something rather than making an off-hand verbal consent. *Id.*; *Cisneros v. State*, 290 S.W.3d 457, 465 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (written consent given by a defendant "weighs in favor of the State" as to a determination of whether consent was voluntary).

Nevertheless, the "voluntariness" of the consent does not resolve the question of whether the consent itself is tainted by an illegal search or seizure, even though the analysis of the relevant factors may overlap. *See Arcila v. State*, 834 S.W.2d 357, 358-59 (Tex. Crim. App. 1992) (citing *Miller v. State*, 736 S.W.2d 643, 649-51 (Tex. Crim. App. 1987)), *overruled on other grounds by Guzman*, 955 S.W.2d at 90. When analyzing the taint, the court cannot simply examine the voluntariness of the consent, "but must specifically evaluate the impact of constitutionally prescribed factors upon the degree to which exploitation of the illegality was attenuated by such consent or by other intervening events and circumstances." *Id.* at 359. In other words, even if the subsequent consent to search was voluntary, the question that remains is whether the consent to search "was itself the product of the illegality." *Id.* at 359 n.1. The State bears the burden to prove that the taint inherent in the initial illegality had dissipated by the time the

voluntary consent was given. *Brick v. State*, 738 S.W.2d 676, 680-81 (Tex. Crim. App. 1987).

In *Brick*, the Court discussed six factors relevant to determining whether such taint had dissipated: (1) the proximity of the consent to the illegality; (2) whether the seizure was brought about by police observation of the particular object for which they sought consent to search; (3) whether the illegal seizure was the result of flagrant police misconduct; (4) whether the consent was volunteered rather than requested by the detaining officers; (5) whether the defendant was made fully aware of the fact he could decline to consent and thus prevent an immediate search; and (6) whether the police purpose underlying the illegality was to obtain the consent. *Id.* More recently, in *State v. Mazuca*, the Court has emphasized that the three factors articulated in *Brown v. Illinois*, 422 U.S. 590 (1975), should be applied in an attenuation-of-taint analysis: (1) the temporal proximity between the unlawful search and the later consent; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of police misconduct. 375 S.W.3d 294, 301-07 (Tex. Crim. App. 2012) (citing *Brown*, 422 U.S. 590); *see also State v. Jackson*, 464 S.W.3d 724, 731 (Tex. Crim. App. 2015) (citing and quoting *Brown*, 422 U.S. at 603-04); *State v. Pena*, 464 S.W.3d 389,

399 (Tex. App.—Corpus Christi 2014, pet. ref'd); *Orosco v. State*, 394 S.W.3d 65, 75 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

## THE TEXAS EXCLUSIONARY RULE

The Texas exclusionary rule provides in relevant part that "[n]o evidence obtained . . . in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005); *see also Wehrenberg v. State*, 416 S.W.3d 458, 468 (Tex. Crim. App. 2013). However, the exclusionary rule does not require the suppression of evidence that was not "obtained" as a result of some illegality. *See Jackson*, 464 S.W.3d at 731 (citing *Johnson v. State*, 871 S.W.2d 744, 750-51 (Tex. Crim. App. 1994); *State v. Daugherty*, 931 S.W.2d 268, 270 (Tex. Crim. App. 1996)). The issue is "whether, granting establishment of the primary illegality," the evidence to which the instant objection is made was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Jackson*, 464 S.W.3d at 731; *Mazuca*, 375 S.W.3d at 300 n.18 (noting that the attenuation-of-taint doctrine "applies in determining whether

evidence has been unlawfully 'obtained' for purposes of" Article 38.23) (quoting *Johnson*, 871 S.W.2d at 750).

ANALYSIS

In this matter, the parties stipulated that the State did not obtain a search warrant. And, on appeal the State raises *only* one basis for its contention that the warrantless search was proper: Stanley voluntarily signed a consent-to-search form. The State argues that it proved by clear and convincing evidence that Stanley's consent was voluntary because he was not detained or arrested when he gave consent, he had been informed he had the option to refuse consent, law enforcement did not coerce or threaten Stanley, and the consent form stated it was signed voluntarily and it "contained constitutional advice, specifically that the Appellee had been warned that he had the right to be free from a warrantless search [and] that he could refuse to give consent to search."

The State argued at the suppression hearing that the initial entry into Stanley's home was part of a "protective sweep," but on appeal the State does not make that argument.[6] At the hearing, the State argued the matter was "a clear case of consent[]" and requested "that the Court deny the Motion to Suppress based on

---

[6] An officer does not need a search warrant to conduct a "protective sweep" which is a "quick and limited search of premises . . . conducted to protect the safety of police officers or others." *See Maryland v. Buie*, 494 U.S. 325, 327 (1990); *Reasor v. State*, 12 S.W.3d 813, 815-16 (Tex. Crim. App. 2000).

22

the consent given by the homeowner Mr. David Stanley." The defense argued that the State was relying solely on consent and that the testimony concerning consent was "conflicting"; however, the defense further argued that "we're not contesting he didn't sign a consent[,]" but only that Stanley consented after the police had been inside his house, which Stanley argued was a violation of the Fourth Amendment. Neither the State nor Stanley provided any analysis in their appellate briefs regarding the attenuation-of-taint factors.

We must determine in this case whether the consent that Stanley gave following the illegal entry was tainted by the police illegality. *See Beaver v. State*, 106 S.W.3d 243, 250 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). We apply the factors as outlined by the Texas Court of Criminal Appeals to determine whether the State sufficiently met its burden to establish an attenuation-of-taint between Stanley's consent and the illegal police conduct. *See Jackson*, 464 S.W.3d at 731 (citing *Mazuca*, the Court emphasized "'the more apt question is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"); *Leal v. State*, 773 S.W.2d 296, 297 (Tex. Crim. App. 1989) (granting discretionary review to consider "whether the taint stemming from the unlawful entry was sufficiently

23

attenuated under the test announced in *Brick v. State* . . . [such] that the consent could be deemed valid.").

In the instant case, the State does not provide a discussion or analysis of any of the attenuation-of-taint factors. The State had the burden of putting forth clear and convincing evidence that "due consideration" of the factors militates in favor of the conclusion "that the taint otherwise inherent in the illegality of the arrest has dissipated." *Brick*, 738 S.W.2d at 681. By failing to offer any analysis of the *Brick* or the *Mazuca* factors, the State has focused solely upon the fact that a voluntary consent-to-search was given, and not upon whether the taint was attenuated. This is what the court in *Brick* referred to as giving "short shrift" to the essence of the appeal. *Id.* at 678. Considering the *Brick* and *Mazuca* factors, as well as the totality of the circumstances, as we must, we cannot say that the trial court abused its discretion in granting the motion to suppress.

With respect to the first *Brick* factor—the proximity of the consent to the illegality—the record indicates that Appellee gave consent outside of the house after the initial entry into the home by law enforcement. The time period between the initial entry and the request for consent is not specified in the record, but Appellee testified that the police were already in his house when they asked him to give written consent. This factor would be favorable to Appellee. *See, e.g., Beaver*,

24

106 S.W.3d at 250. Turning to the second *Brick* factor, the State does not contend on appeal that the initial entry was legal as part of a protective sweep, nor does it dispute Appellee's argument that the items were not in plain view. Therefore, the second factor would also favor Appellee. *See id.* Considering the third factor, courts ordinarily do not deem police misconduct as "flagrant" unless the illegal conduct was engaged in for the purpose of obtaining consent, or the police misconduct was calculated to cause surprise or fear. *Id.* at 250-51 (citing *Renfro v. State*, 958 S.W.2d 880, 886 (Tex. App.—Texarkana 1997, pet. ref'd)). In *Beaver*, the court noted that although the record indicated that the police officers exceeded the lawful scope of their search of the appellant's apartment, there was no evidence that the appellant, who was outside of the apartment, even knew of the illegality. *Id.* at 251. Here, the record reflects that Stanley was aware of the officer's entry into and search of his home. Stanley testified "I turned around and looked up at my house and just kind of smiled. I said, it's late for that, ain't it? Because there were already two officers in my house. And I told him, yes, sir, I'll sign it so y'all don't tear my house up." Viewing the evidence, as we must, in the light most favorable to the trial court's ruling, we conclude that trial court could have reasonably concluded that this factor is either neutral or weighs in favor of Stanley. The fourth factor—whether the consent was volunteered or requested by the police—also

25

favors Stanley because the testimony indicates that the police expressly asked for Stanley's consent. As to the fifth factor, however, it favors the State because the record contains evidence that Stanley was informed of his right to refuse consent. Additionally, as in *Beaver*, the written consent form signed by Stanley stated in writing that Stanley had the right to refuse consent to search. *See id.* We also note that the consent-to-search form was entered into evidence without any objection. The sixth factor—whether the police engaged in the illegal conduct for the purpose of obtaining consent—would either be neutral or weigh in favor of Stanley in light of our discussion of the third factor. We have already determined that the record supports the trial court's implicit finding that the illegal conduct was calculated to cause surprise or fear. In summary, when the record is considered in the light most favorable to the trial court's ruling, we conclude that the ruling would be consistent with the application of the *Brick* factors.

Alternatively, with respect to the application of the three *Mazuca* factors, we also find nothing in the record or briefs to suggest that a significant amount of time transpired between the initial warrantless entry by law enforcement into Stanley's house and Stanley's later signing of the consent-to-search form. And, neither the record nor the briefs suggests that there were any intervening circumstances between the officers' initial entry into Stanley's home and Stanley giving written

consent which might have attenuated the taint of the initial warrantless search of the house.

The officers testified that their purpose in going to Stanley's house concerned a tip they received about Reed. Testimony at the hearing reflects that the officers' stated purpose for entering the house was to get Plank out of the house, but the State does not argue on appeal that a protective sweep justified the entry. Lima reported that he observed drug paraphernalia while he was inside the house to get Plank, and Stanley testified that the items seized were not in plain view. *Cf. Beaver*, 106 S.W.3d at 250 (concluding that police did not act illegally in seizing evidence the police could see from the doorway, but did act illegally in seizing evidence observed only after an illegal search).

Based upon the testimony, the trial court could have reasonably concluded that the officers' initial purpose in being at the house, that is, to find Reed and to investigate a tip regarding Reed, then changed after the officers went inside the house to get Plank and noticed drug paraphernalia on the coffee table. As the exclusive trier of fact and judge of the credibility of the witnesses, the trial court could have believed the testimony of Stanley over the testimony of the police officers. *See Orosco*, 394 S.W.3d at 75 (quoting *Brown*, 422 U.S. at 605). In its findings of fact, the trial court found that Officer Lima went into Stanley's house

twice "without permission" and that Officer Jerry went into Stanley's house without Stanley's consent. The trial court also found that a "[s]earch of defendant's residence occurred before defendant signed [the] consent form."

The appellate record, viewed in the light most favorable to the trial court's ruling, supports a conclusion that, under the totality of the circumstances, the warrantless entry into the home was in close temporal proximity to Stanley signing the consent form, that no intervening circumstances occurred between the warrantless search and Stanley's purported consent, and that the warrantless entry by the police was purposeful. The trial court could have reasonably concluded that the taint of the warrantless search of Stanley's house had not sufficiently attenuated when Stanley signed the consent-to-search form as it pertains to the items seized from Stanley's home. Accordingly, we conclude that the trial court did not abuse its discretion in deciding that the consent to search the house was "obtained improperly[]" and that the evidence obtained from the unlawful search of the home should be suppressed.

We overrule the State's issue and we affirm the order of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 29, 2016
Opinion Delivered August 24, 2016
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.