# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00803-CR

**Michael Joseph Tilghman, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
## NO. CR-16-1126, HONORABLE GARY L. STEEL, JUDGE PRESIDING

## O P I N I O N

Following the denial of his motion to suppress evidence, appellant Michael Joseph Tilghman pleaded guilty to the offense of possession with intent to deliver methamphetamine in an amount of four grams or more but less than 200 grams. *See* Tex. Health & Safety Code §§ 481.102(6), .112(a), (d). The district court sentenced Tilghman to 10 years' imprisonment. In a single issue on appeal, Tilghman argues that the district court abused its discretion in denying the motion to suppress. We will reverse the district court's judgment.

## BACKGROUND

The evidence that Tilghman sought to suppress was found inside his hotel room at the Marriott Fairfield Inn in San Marcos, following a warrantless entry into the room by police officers. At the suppression hearing, the State called two witnesses: (1) Joshua Chapman, the hotel night manager who had accompanied the police to Tilghman's room and who had unlocked the door

for the officers and (2) Officer Daniel Duckworth of the San Marcos Police Department, one of the officers who had opened the door and entered the hotel room without a warrant. Also admitted into evidence was a video recording of the entry that was taken from Duckworth's body camera.

Chapman testified that when he arrived at the hotel on the night of October 14, 2016, he received a phone call from one of the managers of a previous shift asking him to remove the occupants of Room 123 "for having drugs in the room." According to Chapman, the basis for the previous manager's belief that drugs were present was "[t]he smell of marihuana coming from the room."[1] Chapman testified that he was familiar with the odor of marihuana and that, as he "walked down the hallway just to be sure," he, too, could smell marihuana emanating from the room.

Chapman recounted that the Marriott chain of hotels has a nonsmoking policy that is advertised in a binder contained within each guest room. Although Chapman testified that there is "a fee" for violating that policy, he acknowledged that the policy does not mention eviction from the hotel as a consequence. Chapman also testified that according to Marriott policy, if a hotel guest commits a crime, "we have to ask them to leave." However, when asked if there was "any sort of rental agreement that describes that policy," Chapman testified, "Not that I know of."

Chapman testified that prior to his arrival at the hotel that night, another manager or hotel employee had knocked on the door of the room "[t]o get [the occupants] to leave" but that "nobody answered" and that "another gentleman said that they were gone." In order to facilitate the

---

[1] When asked if there was any other reason why he wanted the occupants to leave the hotel, Chapman testified that they still owed $50 for the room. However, Chapman added that the occupants were not required to pay the remaining balance until they checked out of the hotel the following morning, and he later acknowledged on cross-examination that it was "[j]ust the marihuana odor," and not the outstanding balance, that had prompted the eviction decision.

eviction, Chapman "decided to call law enforcement because [he] knew there [were] multiple guys in the room" and he was concerned for his safety. Chapman added that he did not call law enforcement to "get anybody in trouble" or to "effect the arrest of anybody." Rather, "it was just to get them evicted from the room."

Chapman further testified that after law enforcement arrived at the hotel, he explained the situation to them and then, after waiting for a third officer to arrive, he led them to the room. Once they were outside the room, Chapman recalled, one of the officers knocked on the door multiple times, but no one answered. One of the officers then advised Chapman that they did not have the right to enter the room, but Chapman did. Chapman then proceeded to unlock the door using a key card, and the officers opened the door.

On cross-examination, Chapman testified that he had never communicated with the occupants of the room, either prior to or following the arrival of law enforcement, nor had he ever knocked on their door. Instead, it was a manager from a prior shift who had knocked on the door at some point prior to Chapman's arrival. Chapman also testified that he did not think the prior manager or any other hotel employees had slid anything under the door informing the occupants that they were no longer welcome at the hotel.

Officer Duckworth testified that he and another officer, Austin Smith, were dispatched to the hotel at approximately 10:52 p.m. that night. Duckworth explained that the dispatch "came in as a marihuana call. The management could smell the odor of marihuana coming from a room and they were requesting assistance in evicting the occupants of that room." When they arrived at the hotel, Duckworth recalled, they were again advised that management and employees

3

had smelled marihuana coming from the room in question. However, when asked if he could smell anything when he had arrived in the hotel lobby, Duckworth testified, "I can't recall."

After a third officer arrived at the hotel, the officers accompanied Chapman to the room. Once there, "Officer Smith knocked on the door multiple times with no answer." The first and second times that Smith knocked on the door, Smith said nothing, but the third time that he knocked, Smith announced, "San Marcos Police. Come open the door." No one answered. However, Duckworth testified that he heard "whispering" inside the room, so he knew that people were inside. When asked if he heard "anything else relating to activity in the room while you were standing outside the door," Duckworth testified, "I did not."

After Smith's announcement failed to bring anyone to the door, Duckworth told Chapman that they "wouldn't be able to do anything but he could." Specifically, Duckworth can be heard on the recording telling Chapman, "We don't have the authority to open the door, but you do." Chapman can then be seen taking his key card out of his pocket and holding it while Duckworth gestured toward the door with his hand. Chapman then approached the door, tapped the key card to the door lock, and stepped back as both Smith and Duckworth proceeded to turn the handle on the door and push the door open. Duckworth testified that as he opened the door, he heard the sound of a toilet flushing, which led him to believe that there was someone inside the bathroom.

Duckworth recounted, "As the door opened there were two people standing in the hallway closest to the—closest to the door. One person was standing partially inside the open bathroom door. I couldn't see his left hand. I asked him to move to his right and show his hands, which he did." That man, later identified as Bo Zimmerhanzel, asked the officers, "What's going

4

on here?" Duckworth informed the men "that they were no longer welcome at the hotel and that the management was requesting that they gather their belongings and leave." Duckworth then asked if there was anyone else inside the room, and Zimmerhanzel pointed to the bathroom and told the officers that another man was inside. That man, later identified as Travis Ward, then "popped his head out of the bathroom door" and was holding a disposable shaving razor. Ward told the officer that he had been shaving. Duckworth, however, did not see any water or shaving cream on Ward's face. The third occupant of the hotel room, who had been standing behind Zimmerhanzel when the officers opened the door, was later identified as Tilghman.[2]

Approximately 30 seconds after opening the door, the officers entered the room. When asked to explain why they entered the room, Duckworth testified as follows:

> With the flushing sounds and him saying that he was shaving with no evidence of him shaving; him being in the bathroom whenever I heard the flushing sound; and then the general behavior with the call of narcotics, we decided to make entry into the room to prevent further destruction of evidence and as officer safety whenever they were gathering their belongings because typically with narcotics comes firearms and weapons.

Duckworth added, "I didn't ask for permission to enter, but as we were breaking that threshold [of the doorway,] Mr. Zimmerhanzel invited us in."[3] Once the officers were inside the room, the occupants claimed that they had not heard the officers knocking on the door and that they had been

---

[2] Tilghman and Ward were co-defendants in the case, although Ward has not appealed the suppression order. Zimmerhanzel was not a party to the proceedings in the court below.

[3] This is difficult to hear on the recording, but Zimmerhanzel apparently said, "Come on, come on in, man," after Officer Smith had already entered the room.

5

playing a guitar. However, Duckworth testified that the officers "didn't hear any guitar sounds coming from the room," only whispering.

According to Duckworth, after the officers had entered the room, they "stood around . . . in different areas and then we just told them to collect their belongings and essentially stood there until we started observing narcotics in plain view."[4] This evidence included "a glass container containing marihuana on the nightstand in between the two beds" and, in the drawer to the nightstand, "a small, clear plastic bag containing a white crystalline substance" that Duckworth recognized as methamphetamine. After detaining the men, the officers "searched the areas immediately around them" and found additional narcotics in the trash can, specifically "another plastic bag containing many smaller, clearer plastic bags containing methamphetamine."

On cross-examination, Duckworth was asked whether he would have been able to enter the room and evict the men if the only issue had been the outstanding $50 balance owed on the room. Duckworth answered, "No," and explained that hotel occupants "have a certain expectation of privacy in a hotel room," although he acknowledged that when there are payment issues, "it gets a little fuzzier . . . as far as law enforcement is concerned." Duckworth was also asked if he had smelled marihuana as he was standing outside the room. He answered, "I don't recall." Additionally, Duckworth agreed that the officers had stepped through the threshold of the doorway before any of the occupants had given them permission to enter the room.

---

[4] The video recording that was admitted into evidence stopped shortly after the officers entered the room. Thus, the officers' discovery of narcotics is not shown on the recording.

Duckworth further testified that he believed, given the circumstances, that Chapman could have evicted the occupants on his own but that he had contacted law enforcement for help because the occupants had earlier "refused to come to the door." Duckworth also explained that hotel guests can be charged with criminal trespass if their reservation expires and they refuse to leave despite receiving notice from management that they need to go. Duckworth acknowledged, however, that no such notice had been given in this case, although he claimed that this was because "the residents of the room refused to answer their door." Duckworth also testified that following the arrests of the men, he had attempted to ascertain whether there had been a rental agreement in place for the room, but hotel management informed him that "there's no written rental agreement that the occupants would have to sign."

After hearing the above evidence, the district court took the matter under advisement and subsequently denied the motion to suppress. Later, the district court made findings of fact and conclusions of law, including the following:

1.  The Court finds that the Defendant had a substantially diminished expectation of privacy in the hotel room he was occupying with co-Defendants due to their eviction by hotel staff, including Joshua Chapman, for hotel policy violations.

2.  The Court finds that Joshua Chapman had a right to enter the room to facilitate that eviction and as a result, Officers, including Officer Duckworth, had a right to enter the room at the invitation of Mr. Chapman to assist in facilitating the eviction.

3.  The Court finds that the presence of contraband in plain view allowed for the lawful arrest of the Defendant and co-Defendants without a warrant for that contraband.

7

4.     The Court finds that the lawful arrest of the Defendant and co-Defendants allowed for a lawful search of the hotel room incident to the arrest, which led to the discovery of the narcotics at issue in this case in the trash can.

5.     The Court finds that even if Defendant had a reasonable expectation of privacy in the hotel room he was occupying, Officer Duckworth and his companions had probable cause to believe that a crime was being committed in the hotel room based upon the information relayed to them by hotel staff upon their arrival at the hotel.

Additionally, the Court finds that exigent circumstances existed to justify the warrantless entry and search of the hotel room based upon the possible destruction of evidence. The information relayed to them by hotel staff included the failure of the Defendant and co-Defendants to answer the Officer's knocks, the noises heard through the door prior to it being opened, the sound of the toilet flushing as the door was being opened, and co-Defendant Ward's explanation of his behavior in the bathroom as well as the physical observations of him that contradicted that explanation are all facts that supported a reasonable concern that evidence was being destroyed on behalf of the Officers present.

6.     The Court finds that even if the Defendant had a reasonable expectation of privacy in the hotel room he was occupying, and even if probable cause did not exist sufficient to support a reasonable belief that a crime was being committed in the hotel room, and even if there were not specific articulable facts present to support the existence of exigent circumstances sufficient to support the warrantless entry and search of the hotel room, that co-Defendant Zimmerhanzel consented to the entry of the hotel room occupied by the Defendant by Officers.

After reserving his right to appeal the denial of his motion to suppress, Tilghman pleaded guilty to possession with intent to deliver methamphetamine and was sentenced to 10 years' imprisonment as noted above. This appeal followed.

8

## STANDARD OF REVIEW

"We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review." *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018) (citing *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016)); *see Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997). "At a motion to suppress hearing, the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony." *Lerma*, 543 S.W.3d at 190 (citing *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). "Therefore, we afford almost complete deference to the trial court in determining historical facts." *Id.* (citing *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)). "When a trial judge makes express findings of fact, an appellate court must examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record." *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017) (citing *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010)). "The appellate court then proceeds to a de novo determination of the legal significance of the facts as found by the trial court—including the determination of whether a specific search or seizure was reasonable." *Id.* (citing *Kothe v. State*, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004)).

## DISCUSSION

**Tilghman's expectation of privacy in the hotel room**

We first consider the district court's conclusions that Tilghman "had a substantially diminished expectation of privacy in the hotel room" due to his eviction from the room and that the police officers "had a right to enter the room at the invitation of [hotel management] to assist in facilitating the eviction." For the reasons that follow, we disagree.

9

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]'" *Id.* (quoting U.S. Const. amend. IV). "The central concern underlying the Fourth Amendment has remained the same throughout the centuries; it is the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *Id.* at 8–9 (citing *State v. Granville*, 423 S.W.3d 399, 405 (Tex. Crim. App. 2014)). Accordingly, "[a] search, conducted without a warrant, is per se unreasonable, subject to certain 'jealously and carefully drawn' exceptions." *Id.* at 9 (citing *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)).

"The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 9 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)). "Of course, Fourth Amendment protections of the 'home' are not limited to houses," *id.*, but extend to other dwelling places, including apartments, *see State v. Rendon*, 477 S.W.3d 805, 810–11 (Tex. Crim. App. 2015), college dormitories, *see Rodriguez*, 521 S.W.3d at 9, and hotel rooms, *see Moberg v. State*, 810 S.W.2d 190, 194 (Tex. Crim. App. 1991).

In arguing that the police conduct in this case violated his Fourth Amendment rights, Tilghman relies on *Stoner v. California*, 376 U.S. 483 (1964). In that case, the police, during a robbery investigation, approached the night clerk at a hotel and asked the clerk for permission to enter a room where they believed the suspect was staying. *Id.* at 485. The clerk informed the officers that the suspect was "out at this time," but he gave the officers permission to enter the room and, additionally, offered to take them "directly to the room." *Id.* The clerk then led the officers to

10

the room, "placed a key in the lock, unlocked the door, and [said], 'Be my guest.'" *Id*. The officers then proceeded to search the room and discovered evidence of the crime. *Id*. at 485–86.

The United States Supreme Court, in concluding that the evidence was obtained in violation of the Fourth Amendment, rejected the State's contention that the warrantless entry "was lawful because it was conducted with the consent of the hotel clerk." *Id*. at 487–88. The Court explained that "the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" *Id*. at 488. The Court added, "It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent." *Id*. at 489. The Court concluded that, "[n]o less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures" and that this "protection would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel." *Id*. at 490.

The State contends that the facts in *Stoner* are distinguishable from the facts here because "Stoner still had occupancy rights at the time hotel management allowed law enforcement access to his room." "In contrast," the State asserts, "[Tilghman] and his co-defendants were being evicted right then and there."

As support for its position that the eviction provided the police with authority to enter the room without a warrant, the State cites to state and federal cases holding that the expiration of a hotel guest's term of occupancy or the eviction from the premises "substantially diminishes" the

11

guest's reasonable expectation of privacy in the room. For example, in *Brimage v. State*, 918 S.W.2d 466 (Tex. Crim. App. 1996) (op. on reh'g), the Court of Criminal Appeals concluded that after a motel guest's term of occupancy had expired, "'[t]he manager of a motel then has the right to enter the room and may consent to a search of the room and the seizure of the items there found.'" *Id*. at 507 (quoting *United States v. Parizo*, 514 F.2d 52, 54 (2nd Cir. 1975)); *see also State v. Porter*, 940 S.W.2d 391, 393 (Tex. App.—Austin 1997, no pet.) (observing that "[t]he expiration of [the guest's] lease, therefore, ended his reasonable expectation of privacy in the motel room and gave [the motel manager] the right to enter the room" and consent to police officer's search). Similarly, in *Voelkel v. State*, 717 S.W.2d 314 (Tex. Crim. App. 1986), the Court of Criminal Appeals concluded that a hotel guest had "a substantially diminished expectation of privacy . . . by the time [the police] arrived to facilitate her eviction" because, beginning on the previous evening, hotel management "had thrice told appellant she had to be gone by 1:00 p.m. on the 20th. Yet at 3:00 p.m. she was still there, evidencing no particular haste to depart." *Id*. at 315; *see also Bass v. State*, 713 S.W.2d 782, 786 (Tex. App.—Houston [14th Dist.] 1986, no pet.) (concluding that guest who owed hotel $7500 at time of her eviction "had no reasonable expectation of privacy in the hotel room once she had failed to pay her bill").

Furthermore, the State cites to federal cases that have reached similar conclusions. *See, e.g.*, *United States v. Peoples*, 854 F.3d 993, 996 (8th Cir. 2017) (concluding that police entry into hotel room did not violate Fourth Amendment where police were acting pursuant to Missouri law that allowed hotel management to evict guests who are "using the premises for an unlawful purpose"); *United States v. Tolbert*, 613 Fed. Appx. 548, 551 (7th Cir. 2015) (concluding that

12

because hotel room had been rented "subject to the condition that guests who violate its no-party policy are subject to immediate eviction," hotel guest lost his right to privacy once management authorized officers to evict him for violating that policy); *United States v. Bass*, 41 Fed. Appx. 735, 737 (6th Cir. 2002) (concluding that hotel management "had no authority to subvert [the defendant's] exclusive right to consent to the search of his hotel room in the absence of any evidence that the hotel management had decided to evict him at the time of the search"). The common thread in these cases is evidence showing that the guest has been evicted from the hotel or his term of occupancy has expired, thereby diminishing his reasonable expectation of privacy in the room.

In this case, however, the term of occupancy for the hotel room had not yet expired at the time the police opened the door and entered the room. Chapman testified that the room had been reserved until check-out the following morning and that the balance owed on the room did not have to be paid until the time of check-out. Thus, because Tilghman, Ward, and Zimmerhanzel still had a right to occupy the room at the time of the warrantless entry, they still had a reasonable expectation of privacy in the room. Accordingly, the *Brimage* and *Voelkel* line of cases do not apply here.

The cases holding that a hotel guest loses his right to privacy following eviction from the hotel are similarly inapplicable on the facts of this case. Although the hotel had a nonsmoking policy, Chapman testified that the consequence for violating that policy was "a fee," not eviction from the hotel. Although Chapman also testified that, according to hotel policy, if a guest commits a crime on the premises, "we have to ask them to leave," the State provided no evidence explaining the specific terms of this policy, including the extent to which the policy allowed hotel management

13

to immediately evict its guests without notice.  In fact, when asked if there was "any sort of rental agreement that describes that policy," Chapman testified, "Not that I know of," and Officer Duckworth similarly testified that hotel management had informed him that "there's no written rental agreement that the occupants would have to sign."

Moreover, even if the hotel had a policy allowing for immediate eviction under the circumstances in this case, there was no evidence presented that the occupants were aware of that policy so as to diminish their reasonable expectation of privacy in the room.  Chapman testified that he never communicated with the occupants of the room, nor had he ever knocked on their door.  Instead, another manager or hotel employee had knocked on the door at some point prior to Chapman's arrival that evening.  However, according to Chapman, "nobody answered" the door and "another gentleman said that they were gone" at the time the hotel employee had knocked.  Chapman also testified that he did not think the prior manager or any other hotel employee had slid anything under the door informing the occupants that they were no longer welcome at the hotel.[5]

---

[5]  The State asserts, and the dissent agrees, that notice of the eviction was not required because under Texas property law, "[t]here is no landlord-tenant relationship between a hotel and its guest," and "an innkeeper has no duty to keep a guest indefinitely and has the right to evict a guest . . . 'without resort to legal process, provided no more force is used than necessary.'" *Bertuca v. Martinez*, No. 04-04-00926-CV, 2006 Tex. App. LEXIS 1386, at *6–7 (Tex. App.—San Antonio Feb. 22, 2006, no pet.) (mem. op.) (quoting *McBride v. Hosey*, 197 S.W.2d 372, 374 (Tex. Civ. App.—El Paso 1946, writ ref'd n.r.e.).  We decline to apply these principles to criminal proceedings where a defendant's Fourth Amendment rights are at stake.  As the United States Supreme Court explained in *Stoner*, it would be "'unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical.'" 376 U.S. at 488 (quoting *Jones v. United States*, 362 U.S. 257, 266-267 (1960)).  The Court added, "'We ought not to bow to them in the fair administration of the criminal law.  To do so would not comport with our justly proud claim of the procedural protections accorded to those

14

The dissenting opinion acknowledges that the hotel evicted Tilghman without notice but nevertheless contends that the eviction was proper and therefore that the police could enter the hotel room to effectuate that eviction. However, if we were to hold that a hotel can evict its guests from their rooms without notice during their term of occupancy and that the police need nothing more than the request of hotel staff to effectuate such an eviction, then hotel guests would no longer have any reasonable expectation of privacy in their hotel rooms. Such a holding would be contrary to the decision of the United States Supreme Court in *Stoner*, which held that "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures" and that this "protection would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel." 376 U.S. at 490. Requiring notice of eviction is one way in which courts can ensure that a hotel guest's privacy rights are not left to the "unfettered discretion" of hotel employees. Additionally, notice of eviction provides evidence from which courts can conclude that, prior to police entry, a hotel guest had lost his reasonable expectation of privacy in the hotel room. *See, e.g., Voelkel*, 717 S.W.2d at 315 (concluding that "appellant had a substantially diminished expectation of privacy" in hotel room "by the time [police officers] arrived to facilitate her eviction" because, prior to police arrival, "appellant was informed on three occasions that she would have to leave the hotel"). Because there is no such evidence here, we cannot agree with the dissent's view that the police actions in this case were justified.

In summary, although there are some circumstances in which hotel guests have a diminished expectation of privacy in their room following either their lawful eviction from the hotel

charged with crime.'" *Id*.

15

or the expiration of their term of occupancy, the State failed to satisfy its burden to prove that such circumstances were present here. *See State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018) (observing that State had burden of proof at suppression hearing to demonstrate that police action in absence of warrant was reasonable and legal). Instead, the record reflects that, similar to the circumstances that the United States Supreme Court found unconstitutional in *Stoner*, the hotel night manager led police officers to a hotel room still occupied by Tilghman, unlocked the door for the officers, and stepped back as the officers, without a warrant, opened the door themselves and proceeded to enter the room. Under these circumstances, we conclude that Tilghman's Fourth Amendment rights were violated.[6] *See Stoner*, 376 U.S. at 490; *Moberg*, 810 S.W.2d at 194.

---

[6] We note that the Fourth Amendment violation was not limited to the physical entry into the hotel room but occurred as soon as the police opened the door to the room, enabling them to see and hear what was occurring inside. *See Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes."); *Katz v. United States*, 389 U.S. 347, 353 (1967) (explaining that "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures" and that "the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure"); *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997); (concluding that "an unconstitutional search occurs when officers gain visual or physical access to a motel room" after door has been involuntarily opened); *United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991) (discussing "a person's right to choose to close his door on and exclude people he does not want within his home," which is "one of the most—if not the most—important components of a person's privacy expectation in his home"); *United States v. Maez*, 872 F.2d 1444, 1451 (10th Cir. 1989) ("While 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed' the [Supreme] Court has 'refused to lock the Fourth Amendment into instances of actual physical trespass.'"); *United States v. Winsor*, 846 F.2d 1569, 1572 (9th Cir. 1988) (en banc) (rejecting government's contention that "the police did not effect a search when they first viewed the interior of the [hotel] room because they had not yet physically entered it" and explaining that "[t]o draw a distinction based upon whether there had been a physical entry into the premises would enable police officers to evade the reach of the Fourth Amendment simply by forcing a door open and visually examining the interior without crossing the threshold").

16

**Exigent circumstances did not justify the warrantless intrusion**

The district court concluded in the alternative that, even if Tilghman had a reasonable expectation of privacy in the hotel room, the officers "had probable cause to believe that a crime was being committed in the hotel room based upon the information relayed to them by hotel staff upon their arrival at the hotel." The district court further concluded that "exigent circumstances existed to justify the warrantless entry and search of the hotel room based upon the possible destruction of evidence."

"To validate a warrantless search based on exigent circumstances, the State must satisfy a two-step process." *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007) (citing *Parker v. State*, 206 S.W.3d 593, 597 (Tex. Crim. App. 2006)). "First, there must be probable cause to enter or search a specific location." *Id*. "In the context of warrantless searches, probable cause exists 'when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality . . . or evidence of a crime will be found.'" *Id*. (quoting *Estrada v. State*, 154 S.W.3d 604, 609 (Tex. Crim. App. 2005)). "Second, an exigency that requires an immediate entry to a particular place without a warrant must exist." *Id*. "If the State does not adequately establish both probable cause and exigent circumstances, then a warrantless entry will not withstand judicial scrutiny." *Id*.

17

Assuming *arguendo* that the State satisfied its burden to establish probable cause,[7] we cannot conclude on this record that the State satisfied its burden to establish exigency. "The exigency exception operates 'when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *Weems v. State*, 493 S.W.3d 574, 578 (Tex. Crim. App. 2016) (quoting *Missouri v. McNeely*, 569 U.S. 141, 148–49 (2013)). "Exigency potentially provides for a reasonable, yet warrantless search 'because "there is compelling need for official action and no time to secure a warrant."'" *Id.* (quoting *McNeely*, 569 U.S. at 149). "Whether law enforcement faced an emergency that justifies acting without a warrant calls for a case-by-case determination based on the totality of circumstances." *Id.* Additionally, the emergency must exist at the time of the warrantless intrusion. *See Mincey v. Arizona*, 437 U.S. 385, 393 (1978); *see also United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) ("[T]he critical time for determining whether any exigency exists is the moment the officer makes the warrantless entry. They cannot rely on exigencies discovered once they are inside."); *United States v. Vega*, 221 F.3d 789, 799–800 (5th Cir. 2000) (explaining that exigent circumstances must exist prior to challenged police conduct). The Court of Criminal Appeals has

---

[7] We note that the district court's probable-cause determination was based primarily on evidence that Chapman and other hotel employees had smelled an odor of marihuana emanating from the room at some point prior to the arrival of police. However, Officer Duckworth testified that he "did not recall" whether he could smell marihuana in either the hotel lobby or standing outside the hotel room. Thus, to the extent the record supports a finding of probable cause, the evidence to support that finding is not particularly compelling. *See State v. Steelman*, 93 S.W.3d 102, 107–09 (Tex. Crim. App. 2002) ("The odor of marihuana, standing alone, does not authorize a warrantless search and seizure in a home."); *but see Estrada v. State*, 154 S.W.3d 604. 608–09 (Tex. Crim. App. 2005) (concluding that odor of marihuana, when combined with other factors, supported probable-cause determination).

identified "three categories of exigent circumstances that justify a warrantless intrusion by police officers: 1) providing aid or assistance to persons whom law enforcement reasonably believes are in need of assistance; 2) protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous; and 3) preventing the destruction of evidence or contraband." *Gutierrez*, 221 S.W.3d at 685 (citing *McNairy v. State*, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991)).

The only exigency urged by the State at the suppression hearing (and the only exigency specified by the district court in its findings and conclusions) was the need to prevent the destruction of evidence or contraband.[8] In order for this exigency to apply, the record must support

---

[8] On appeal, the State also argues that the warrantless search was justified by the need of the officers to conduct a "protective sweep" of the premises and to "protect police officers from persons whom they reasonably believe to be present, armed, and dangerous." Although the State acknowledges in its brief that it argued neither of these theories during the suppression hearing, it asserts that these are "theories of law applicable to the case" that should be addressed on appeal. We disagree. "A 'theory of law' is applicable to the case if the theory was presented at trial in such a manner that the appellant was fairly called upon to present evidence on the issue." *State v. Copeland*, 501 S.W.3d 610, 613 (Tex. Crim. App. 2016). Here, the record reflects that neither the "protective sweep" nor the "officer safety" theories were presented at the suppression hearing in such a manner. Thus, they are not "law applicable to the case" and cannot be used to affirm the district court's order. *See State v. Esparza*, 413 S.W.3d 81, 90 (Tex. Crim. App. 2013) (holding that if "alternative legal theory that an appellee proffers for the first time on appeal as a basis to affirm a trial court's otherwise faulty judgment turns upon the production of predicate facts by the appellant that he was never fairly called upon to adduce during the course of the proceedings below," then "alternative legal theory should not be considered 'law applicable to the case' under these circumstances, and this is so regardless of whether the appellee was the defendant or the State at the trial court level").

Moreover, even if these theories were "law applicable to the case," we could not conclude on this record that the State satisfied its burden to prove that either theory justified the officers' actions. Although the video recording shows that Tilghman was wearing what appeared to be a utility knife attached to his pants, and that the officers noticed this knife and asked Tilghman to hand it over to them after the officers had entered the room, the record does not support a finding that the

19

a finding that "the officer reasonably believed that the removal or destruction of evidence was imminent." *Turrubiate v. State*, 399 S.W.3d 147, 153 (Tex. Crim. App. 2013). This requires the State to adduce "proof of imminent destruction based on affirmative conduct by those in possession of narcotics in a particular case." *Id*. (citing *Kentucky v. King*, 563 U.S. 452, 470 (2011)). "[T]he mere possibility that evidence may be destroyed does not give rise to a finding of exigent circumstances." *Id*. at n.4.

According to the State, the following circumstances supported the officers' belief that evidence destruction was imminent: (1) hotel staff had reported an odor of marihuana emanating from the room earlier that night; (2) the occupants of the room refused to answer the door; (3) the officers could hear whispering inside the room; (4) Officer Duckworth heard the sound of a toilet flushing; and (5) Ward was in the bathroom, where he claimed to have been shaving despite the absence of water and shaving cream on his face.[9] However, Officer Duckworth testified that he did not hear the toilet flushing until after he had already begun to open the door, and Ward was not seen in the bathroom until after the door had been opened. Accordingly, those circumstances do not factor into the exigency analysis. Instead, we consider only the circumstances that were known to

officers reasonably believed, prior to their warrantless entry, that any of occupants inside posed a danger to the officers or others so as to justify either a protective sweep of the hotel room or a warrantless entry into the room for "officer safety" purposes. *See Cooksey v. State*, 350 S.W.3d 177, 186–87 (Tex. App.—San Antonio 2011, no pet.) (rejecting "protective sweep" and "officer safety" justifications for warrantless entry where officers were not investigating violent crime and there was no evidence presented that defendant posed danger to officers or others).

[9] The State also appears to place significance on the fact that Tilghman "was in the process of being evicted" from the hotel. However, as we have already explained, there was no evidence presented that Tilghman or the other occupants were aware of that pending eviction prior to the police opening the door and informing them that they were no longer welcome at the hotel.

the officers prior to their decision to open the door without a warrant. *See Mincey*, 437 U.S. at 393; *Johnson*, 256 F.3d at 907; *Vega*, 221 F.3d at 799–800.

Those circumstances are not sufficient to support a finding of exigency. In determining whether the record supports a finding that officers reasonably believed that the removal or destruction of evidence was imminent, courts "require some evidence of exigency beyond mere knowledge of police presence and an odor of illegal narcotics." *Turrubiate*, 399 S.W.3d at 154. Such evidence can include sounds of "furtive movements" coming from inside the residence suggesting that the occupants "intend[] to destroy evidence." *See id*. However, sounds that are "'indistinguishable from any household sounds, and [are] consistent with the natural and reasonable result of a knock on the door'" are insufficient. *See id*. at 155 (quoting *King v. Commonwealth*, 386 S.W.3d 119, 122 (Ky. 2012)). Here, the only sound that the officers heard prior to opening the door was whispering. We cannot conclude that the sound of whispering, combined with no one answering the door, supports a finding that the officers reasonably believed that evidence destruction was imminent at the time they opened the door to the hotel room. *See id*. at 153–54; *see also King*, 563 U.S. at 469–70 ("[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak."); *United States v. Ramirez*, 676 F.3d 755, 763 (8th Cir. 2012) (concluding that absence of sounds coming from hotel room, other than "the sound of someone approaching [the door] after [officer] had knocked" did not support finding of exigent circumstances). Accordingly, the officers' decision to open the door without a warrant was not supported by exigent circumstances.

**The "plain view" and search-incident-to-arrest exceptions to the warrant requirement do not apply**

The district court also concluded that "the presence of contraband in plain view allowed for the lawful arrest of the Defendant . . . without a warrant for that contraband" and that "the lawful arrest of the Defendant . . . allowed for a lawful search of the hotel room incident to the arrest, which led to the discovery of the narcotics at issue in this case in the trash can." However, neither of those exceptions to the warrant requirement apply here.

"In certain circumstances a warrantless seizure by police of an item that comes within plain view during their lawful presence in a private area may be reasonable under the Fourth Amendment." *Rodriguez*, 521 S.W.3d at 18 (citing *State v. Dobbs*, 323 S.W.3d 184, 187 (Tex. Crim. App. 2010)). "For a plain-view seizure to be lawful, the officer must have had lawful authority to be in the location from which he viewed the item, and the incriminating nature of the item must be immediately apparent." *Id*. Here, as we explained above, the officers did not observe the contraband until after they had entered the hotel room. Because Tilghman had a reasonable expectation of privacy in the hotel room and the warrantless entry by police was not justified by "exigent circumstances," the police did not have lawful authority to be inside the room where they viewed the contraband. Accordingly, the plain-view exception does not apply here. *See id*.; *State v. Betts*, 397 S.W.3d 198, 207 (Tex. Crim. App. 2013); *see also Horton v. California*, 496 U.S. 128, 136 (1990) ("It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."); *Keehn v. State*, 279 S.W.3d 330, 335 (Tex. Crim. App.

2009) ("Plain view, in the absence of exigent circumstances, can never justify a search and seizure without a warrant when law enforcement officials have no lawful right to access an object.").

Similarly, Tilghman, Ward, and Zimmerhanzel were arrested only as a result of the discovery of contraband that the officers did not observe until after they had unlawfully entered the hotel room. Consequently, Tilghman's arrest and the search incident to that arrest were "fruit of the poisonous tree," and the evidence obtained during that search should also have been excluded. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *United States v. Jones*, 619 F.2d 494, 498 (5th Cir. 1980); *United States v. Robinson*, 535 F.2d 881, 883 (5th Cir. 1976); *Wehrenberg v. State*, 416 S.W.3d 458, 464 (Tex. Crim. App. 2013).

**The State failed to prove that Zimmerhanzel's "consent" was voluntarily given or sufficiently attenuated from the unlawful entry**

As noted earlier, Zimmerhanzel can be heard on the video recording saying, "Come on, come on in, man," after Officer Smith began entering the room. In his testimony, Officer Duckworth characterized this statement as Zimmerhanzel "inviting" the officers into the room. Based on this evidence, the district court concluded that "Zimmerhanzel consented to the entry of the hotel room occupied by the Defendant by Officers."[10]

Consent is a "jealously and carefully drawn" exception to the warrant requirement. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). "When a prosecutor seeks to rely upon consent to

---

[10] This was another legal theory that the State failed to argue at the suppression hearing, and it does not appear to have been fully litigated in the court below. However, because the district court considered the issue of consent in its ruling, we will similarly consider it on appeal as a theory of law applicable to the case.

justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Id*. at 548–49; *see Carmouche*, 10 S.W.3d at 331. Moreover, consent is not voluntarily given when it is "the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). The voluntariness of consent "is a question of fact to be determined from the totality of all the circumstances." *Id*. at 227. "[I]f under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then . . . the consent [is] invalid and the search unreasonable." *Id*. at 233. "Although the federal constitution only requires the State to prove the voluntariness of consent by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and convincing evidence that the consent was freely given." *Carmouche*, 10 S.W.3d at 331 (citing *State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997)).

Here, the circumstances surrounding Zimmerhanzel's consent are depicted clearly on the video recording. After the officers knocked on the door repeatedly, announced that they were with the San Marcos Police Department, and proceeded to open the door, Zimmerhanzel and Tilghman can be seen standing near the door, with Zimmerhanzel appearing surprised. One of the officers tells the occupants, "How's it going? San Marcos Police Department. What's going on, guys?" Zimmerhanzel, who is standing partly inside the bathroom, responds, "Nothing. Goddamn. What's going on here?" An officer replies, "Hey, let me see your other hand." Zimmerhanzel complies by stepping outside the bathroom and showing the officers both of his hands. He then tells

24

the officers, "Oh, I'm sorry. Damn, what the hell's going on?" One of the officers announces, "Here's the deal. Y'all, it's time for y'all to leave." Zimmerhanzel asks, "What did we do?" The officer replies, "You are no longer welcome guests of this hotel." Zimmerhanzel again asks, "What did we do, sir? Damn." One of the officers, in an apparent reference to Zimmerhanzel and Tilghman, then asks, "Just y'all two?" Zimmerhanzel points at the bathroom and indicates that another person is inside, either showering or shaving. Ward then emerges from the bathroom, holding a disposable shaving razor, and tells the officers, "Sorry, I'm shaving." Zimmerhanzel again asks, "What, what's the problem here?" Officer Duckworth then gestures his hand toward the door, telling the other officers to "go in, make sure." Officer Smith then enters the room, with another officer following closely behind him. As Smith is walking past the door, Zimmerhanzel then says, "Come on, come on in, man." All of this occurs within 30 seconds of the officers opening the door.

In summary, the recording reflects that the officers knocked on the door repeatedly, announced their presence as police officers, opened the door to the hotel room, asked to see Zimmerhanzel's hands and asked if there was anyone else inside the room, told the occupants that they had to leave the hotel but did not answer Zimmerhanzel's inquiries as to why they were no longer welcome there, and then proceeded to enter the room without asking permission of any of the occupants. Only after one of the officers was already inside the room did Zimmerhanzel tell the officers to "come on in." Thus, the officers clearly conveyed by their words and conduct that they had lawful authority to enter the hotel room. Under these circumstances, we cannot conclude that Zimmerhanzel's consent was anything more than "acquiescence to a claim of lawful authority." Thus, the State failed to satisfy its burden to prove by "clear and convincing evidence" that

25

Zimmerhanzel's consent was voluntarily given. *See Bumper*, 391 U.S. at 546–50 (after officer falsely conveyed to homeowner that he had authority to search her house, homeowner told officer to "come on in"; Supreme Court concluded that homeowner's consent was product of "colorably lawful coercion" and was thus involuntary); *Carmouche*, 10 S.W.3d at 331–33 (concluding that defendant's consent to search, given while he was "closely surrounded by four police officers" and under other coercive circumstances, was not freely and voluntarily given).

Additionally, even if the record supported a finding that Zimmerhanzel's consent was voluntary, that would not end our inquiry. Because Zimmerhanzel's consent was not given until after the unlawful entry, the State must also prove by clear and convincing evidence that the taint inherent in that illegality had dissipated by the time consent was given. *Brick v. State*, 738 S.W.2d 676, 680–81 (Tex. Crim. App. 1987); *State v. Pena*, 464 S.W.3d 389, 399 (Tex. App.—Corpus Christi 2014, pet. ref'd); *Orosco v. State*, 394 S.W.3d 65, 75 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Factors to consider in this analysis include: (1) the temporal proximity between the unlawful entry and the given consent; (2) whether the unlawful entry brought about police observation of the particular object for which consent was sought; (3) whether the search or seizure resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether the person consenting was made fully aware of the right to refuse consent; and (6) whether the police purpose underlying the illegality was to obtain the consent. *See Orosco*, 394 S.W.3d at 75 (citing *Brick*, 738 S.W.2d at 680-81).

Here, the temporal proximity between the time the officers opened the door and the time of Zimmerhanzel's consent was approximately 30 seconds. Thus, the first factor weighs

26

strongly against a finding of attenuation. Regarding the second factor, the officers would not have observed the contraband without the unlawful entry. Therefore, the second factor also weighs against a finding of attenuation. Regarding the third factor, we conclude that the police misconduct in this case was flagrant. As reflected on the recording, the officers knew that they did not have authority to open the door, but nevertheless directed Chapman to unlock the door and then proceeded to open the door themselves. Moreover, once the door was open, only the officers communicated with the occupants. Additionally, the information provided by the officers was vague—despite Zimmerhanzel's repeated requests for an explanation, at no time did the officers explicitly inform the occupants that management had "evicted" them from the hotel or explain to them why they were "no longer welcome" there. Thus, the officers conveyed that they were in charge of the situation rather than hotel management. Accordingly, the third factor also weighs against a finding of attenuation. Although the fourth factor weighs in the State's favor, because Zimmerhanzel volunteered consent, the fifth factor weighs against the State, because the officers did not explain to Zimmerhanzel that he had the right to refuse consent. Finally, the sixth factor also weighs in the State's favor, because it does not appear that the police purpose underlying the unlawful entry was to obtain consent.

In conclusion, four of the six *Brick* factors weigh against a finding of attenuation, and the first factor strongly so. On this record, we conclude that the State failed to satisfy its burden to prove by clear and convincing evidence that the taint inherent in the illegality had dissipated by the time Zimmerhanzel gave consent to enter the room.

27

**CONCLUSION**

We conclude that the police, by opening the door to Tilghman's hotel room and entering the room without a warrant, while Tilghman still had a right to occupy the room, violated Tilghman's Fourth Amendment rights. We further conclude that the entry was not justified by exigent circumstances or any other exception to the warrant requirement. Accordingly, the district court abused its discretion in denying Tilghman's motion to suppress the evidence that was found inside the room. We reverse the district court's judgment and remand for further proceedings consistent with this opinion.

_____
Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Kelly
  Dissenting Opinion by Justice Kelly

Reversed and Remanded

Filed: June 7, 2019

Publish

28